**Roger TAYLOR, Plaintiff,**

v.

**BELGER CARTAGE SERVICE, INC., et al., Defendants.**

No. 83–0057–CV–W–9.

United States District Court,
W.D. Missouri, W.D.

May 23, 1984.

Larry Kinnamon, Jr., Raytown, Mo., for plaintiff.

Michael Gordon, Kansas City, Mo., for defendant Local 41.

Mark Flaherty, Kansas City, Mo., for defendant Belger.

ORDER GRANTING DEFENDANTS'
MOTIONS FOR AWARD OF
ATTORNEY'S FEES

BARTLETT, District Judge.

On December 22, 1982, plaintiff, an employee of Belger Cartage Service, Inc. (hereafter Belger), filed a complaint against his employer and his union, Team-

sters Local 41 (hereafter Local 41). Plaintiff asserted that Belger's refusal to permit him to "bump" a Belger job at the Burlington Northern Ramp was a breach of the collective bargaining agreement between Belger and Local 41. Plaintiff prayed for damages in the amount of $156,000 from defendant Belger. Plaintiff claimed that Local 41 had not fairly represented him during the contractually provided grievance procedure. Plaintiff prayed for damages in the amount of $156,000 from defendant Local 41.

Both defendants moved for summary judgment. Local 41 included in its motion for summary judgment a request for the award of its costs and attorney's fees from plaintiff and his counsel. Summary judgment was granted in favor of the defendants on November 8, 1983. Defendant Local 41 was granted ten days to submit an affidavit in support of its claim for attorney's fees.

On November 17, 1983, Belger filed a motion to amend the order granting summary judgment to permit it to seek an award of attorney's fees. On February 10, 1984, this request was granted and Belger was permitted to provide the Court with the information necessary to rule on its request for attorney's fees.

### Standard for Awarding Attorney's Fees to Prevailing Party

■ Absent a statute or an enforceable contract, litigants in federal court should pay their own attorney's fees. *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). There is no statute specifically authorizing the award of attorney's fees to a prevailing party in a § 301 Fair Representation case.

However, 28 U.S.C. § 1927 authorizes this Court to order the recovery of the prevailing party's attorney's fees from opposing counsel. "Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the Court to satisfy personally the excess costs, expenses, and attorney's

fees reasonably incurred because of such conduct."

■ Furthermore, under *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), federal courts have the inherent power to tax the prevailing party's legal fees "against counsel who wilfully abuse judicial processes." *Id.* at 766, 100 S.Ct. at 2464. Wilful abuse of judicial processes or "bad faith" is not restricted to the circumstances surrounding the filing of the case but also may be found "in the conduct of the litigation." *Id.*

■ The same "bad faith" standard applies to a prevailing party's request for an award of attorney's fees against a party.

[T]his court has recognized post-*Alyeska* that an award of attorney's fees may be proper in an action under section 301 for breach of contract or in a suit for breach of the duty of fair representation, even in the absence of express statutory authorization, if the losing party has acted in bad faith.

*Obin v. District No. 9,* 651 F.2d 574, 577 (8th Cir.1981).

Therefore, plaintiff's conduct in bringing and pursuing this case will be assessed to determine whether it constitutes wilful abuse of judicial processes. The conduct of plaintiff's counsel will be assessed against the same standard as well as against the unreasonable and vexatious multiplication of proceedings' standard in § 1927.

### The Defendants are Entitled to an Amount of Attorney's Fees from Plaintiff's Counsel

On or about August 19, 1982, plaintiff, Roger Taylor, consulted with his attorney about his unsuccessful efforts to obtain work with Belger after being laid off. Taylor explained to his attorney that he had been laid off by Belger for over twenty days; that he had tried to "bump" a Belger job at the Burlington Northern "ramp" that was being performed by a man with less seniority; that Belger had refused Taylor's request to "bump" this job; that Taylor had discussed this problem with Lo-

cal 41 and had been informed that the company's position was consistent with Local 41's interpretation of the contract. Taylor gave his attorney a copy of the current collective bargaining agreement between Belger and Local 41. Taylor called his attorney's attention to Article 43 concerning seniority rights of employees.

Thereafter, Taylor's attorney read part of the collective bargaining agreement and the headnotes to several cases. Also, he remembered *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), from law school.[1]

On August 24, 1982, Taylor's attorney sent a letter to Belger and Local 41 threatening to sue both Belger and Local 41 if Taylor's grievance was not successful. When this letter was written, counsel believed that whether Taylor would be fairly represented by Local 41 in the grievance procedure could be determined solely by the result of the grievance procedure. In other words, if Taylor won the grievance, then Local 41 fairly represented him. If Taylor was not awarded the job along with back pay, then the union had not fairly represented him. Even a cursory reading of *Vaca* would reveal that whether Local 41 fairly represented plaintiff during the grievance procedure must be determined by what Local 41 did or did not do during the grievance procedure, not solely by the result. Counsel's belief in this simplistic and clearly erroneous standard for assessing the fairness of the union's representation persisted through the April 12, 1984, hearing on these motions for an award of attorney's fees.

After Taylor's grievance had been denied by the Joint Union Management Committee, Taylor met with his attorney on December 14, 1982, and told him what had happened during the grievance procedure. Taylor said that Local 41 did not go against him, that Local 41 had backed him up, that Local 41 had done a good job for him, and

that he got "screwed" when a member of another union on the joint committee voted against his grievance. Taylor thought it was wrong for a union man to vote against him. Taylor testified that he told his attorney that even if his grievance had been granted, he would not have been able to keep the Burlington ramp job because other Belger employees with even more seniority than Taylor also were laid off.

At that meeting Taylor's attorney advised that in order to sue Belger for breach of the collective bargaining agreement, Taylor had to "claim" that the union had breached its duty of fair representation. Taylor told his attorney that he was reluctant to sue the union because he thought the union had done a good job. However, he was willing to do whatever was necessary to sue Belger. Taylor's attorney failed to explain clearly to Taylor that he could allege that the union breached its duty of fair representation in a suit against Belger without actually suing the union. *Vaca v. Sipes*, 386 U.S. 171, 187, 87 S.Ct. 903, 915, 17 L.Ed.2d 842 (1967). Taylor reasonably understood from what his attorney said that it was necessary to sue the union in order to sue Belger and that his attorney was recommending that the union be sued. Had Taylor's attorney clearly explained to Taylor that he could pursue his claim against Belger without suing the union, Taylor would not have sued his union.

Before suit was filed on December 22, 1982, Taylor delivered to his attorney a detailed written summary of what happened during the grievance procedure. Therefore, before this case was filed Taylor's attorney had not only his client's oral assessment of the grievance procedure, but also, he had this written summary.

In the complaint filed December 22, 1982, plaintiff's attorney asserted in the count against Belger that:

---

1. Plaintiff's counsel graduated from law school in 1975. During law school he took two semesters of labor law. Although this is the first § 301/fair representation case he has handled,

plaintiff's attorney considers himself to be very knowledgeable in labor law and an expert trial attorney.

The plaintiff has exhausted administrative remedies by processing a grievance to a conclusion unsatisfactory to plaintiff, because Local # 41 of the International Brotherhood of Teamsters negligently and carelessly breached its duty of fair representation to plaintiff in processing a grievance without properly investigating the facts; without interviewing and calling forth necessary material witnesses; and without adequately preparing or presenting the case for plaintiff during the grievance procedure.

In Count II against Local 41, plaintiff's attorney alleged that the union negligently and carelessly breached its duty of fair representation thereby causing plaintiff damage.

■ Even though plaintiff's counsel testified that he was very familiar with *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) when he prepared and filed this complaint, he alleged the wrong standard for assessing the fairness of Local 41's representation. "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory or in bad faith." *Id.* at 190, 87 S.Ct. at 916. Carelessness or even negligence is not the standard.

Had Taylor's attorney used the appropriate and easily ascertainable standard for assessing whether Local 41 had fairly represented plaintiff, he would have realized that in light of the facts then available to him there was no reasonable basis for claiming that the union had acted arbitrarily, discriminatorily or in bad faith. Plaintiff's counsel alleged in the complaint that the union should have called witnesses to testify that the Burlington Northern account was not a house account at the previous cartage company. Therefore, counsel contended that the employee plaintiff was trying to bump should not receive credit for seniority accumulated with the previous cartage company. The facts available to counsel before the case was filed establish that during the first-stage grievance hearing, plaintiff was encouraged by his union

to tell what he had found out about how the Burlington Northern account had been treated by the previous cartage company. Furthermore, during the hearing a union representative on the management-union panel telephoned the union business agent, who had been assigned to the previous cartage company, and verified that Burlington Northern had not been treated as a house account at that time. At the second-stage hearing, Belger and Local 41 agreed that the Burlington Northern account did not come to Belger as a house account. The issues at the second stage were whether Belger, the union and Burlington Northern had agreed to treat the account as a house account and why a grievance had not been filed earlier complaining about treating it as a house account at Belger. Therefore, the status of the Burlington Northern account at the previous cartage company was irrelevant to plaintiff's grievance. The failure to call witnesses on that issue had no effect on the outcome of the grievance.

Taylor's counsel now argues that the testimony offered by Caldwell, a union official, before the second-stage panel demonstrates the unfairness of Local 41's representation. Caldwell testified that Belger, Burlington Northern and the union had agreed that the Burlington account would be treated as a house account by Belger in order to secure the business and jobs for Belger. Taylor and his attorney never had any reason to believe that Caldwell's testimony was not truthful. Taylor's concern, as expressed in his December, 1982, statement, was that Caldwell had come to the hearing "uninvited." However, Taylor was not sure whether Caldwell's testimony helped or hurt him. Taylor's attorney testified that at the time he filed suit he believed, and he still believes, that Caldwell's truthful testimony was a violation of the union's duty of fair representation. He argues vigorously that there is something "rotten in Denmark" because Caldwell testified truthfully about the agreement that he entered into with Belger. Taylor's attorney failed to present any legal authority in support of his position that a union

breaches its duty of fair representation if a union member testifies truthfully in a manner which is helpful to the employer's position on a grievance.

Plaintiff's attorney also testified that when he filed suit he believed that a jury could reasonably conclude that there had been a "backroom deal" between the union and the company to deny Taylor's grievance. Counsel bases this assertion on part of Taylor's written statement that recounts a conversation with union member Catlin before the second-stage hearing. According to Taylor, Catlin told him that Catlin was afraid something was wrong because "they may know something we don't" and "I think somebody is not saying all they know. It just don't seem right." Assuming Taylor reported this conversation accurately, the most reasonable interpretation is that Catlin was warning Taylor that Caldwell would testify that the union had agreed with Belger to treat Burlington Northern as a house account.[2] Even if Local 41 had agreed with Belger that plaintiff's grievance should be denied, the resulting inference is not that Local 41 thereby did not fairly represent plaintiff. Counsel had no basis other than his imagination for concluding that something sinister was suggested by this remark.

Plaintiff's attorney made no effort after suit was filed to investigate the case further. Counsel explained that he did not initiate any discovery because Taylor was poor. Even if that were an excuse for not working on plaintiff's case against Belger, which counsel had accepted on an hourly basis, he should have done something to prepare the contingent fee claim against the union. The failure to interview witnesses or to pursue any discovery effectively counters any argument that might be made that suit was filed in order to utilize discovery to develop factual and legal theories believed reasonable when suit was filed.

On March 1, 1983, plaintiff's deposition was taken by the defendants. Plaintiff testified as follows during this deposition:

Q. (By Mr. Gordon) In 1982, and I understand you were out at the union hall a week or two—

A. —after the second grievance.

Q. After suit was filed?

MR. KINNAMON: Which would be after the second stage.

A. Yeah.

Q. (By Mr. Gordon) Do you remember having a meeting with Mr. Catlin?

A. Yeah. I went out there and I thanked him for representing me and I went in and thanked Doc. I said I don't hold nothing against you. I said I thought you done a good job and I didn't really want to get the union involved, but I said I believe I'm right and I got to take care of this—carry this thing out as far as I can.

Deposition transcript, pp. 143–44.

Q. Let's focus in on Jim for a minute. So you walked up to his desk, I guess?

A. Uh-huh.

Q. What did you say and what did he say during that conversation?

A. I think I mentioned to him that I was going to take it further; that I didn't agree with the decision. But I didn't hold no grudge against Local 41. I said I thought you represented me pretty good, but I said I'm going to make a lawsuit out of it because I don't believe it's a fair decision. And he said, well, why don't you go back and talk to Doc too? So I went back and talked to Doc.

Deposition transcript, pp. 145–46.

Q. So you told Mr. Catlin that, you thanked Mr. Catlin for representing you at the grievance hearings, is that right?

---

**2.** After suit was filed, Taylor told his attorney that another union had voted on whether to make a job a house account. Plaintiff's attorney now argues that Local 41 was acting "ultra vires" when it agreed orally with Belger to treat Burlington Northern as a house account. Regardless of the merits of this position, counsel never explained how it had anything to do with the manner in which plaintiff's grievance was handled. Furthermore, plaintiff's attorney never did any research to determine whether or not Local 41's business agent had authority to make such an oral agreement. He relied solely on his client's statement that another union had voted in a similar situation and on his client's conclusion that therefore it was unlawful not to vote.

A. Right.

Q. And you told him that you thought the union had done a good job?

A. Yeah.

Q. But you disagreed with the committee's decision?

A. Right.

Q. So you were going to take it on?

A. Going further with it.

Q. That was in response as I understand it, to Mr. Catlin's question of if you thought we did a good job why are you suing us?

A. I think Doc asked me that.

Q. Let's keep Doc aside for a minute. Do you recall making a statement to Mr. Catlin to the effect you didn't want to sue the union but you had been advised by your attorney that in order to sue the company you had to sue the union?

A. Yeah. I think I remember saying—I said I don't like suing—I said I don't like suing the union but I said I have to go ahead and sue the union so I can get this thing straightened out, or something like that.

Q. Do you remember saying words to the effect that you had been advised by your attorney that you had to sue the union in order to get to the company?

A. Yeah, I think I did say something like that.

Q. Do you remember that part of the conversation any better than what I have said?

A. Just about what you said. I can't remember all of it.

Q. Was that a true statement that you made to Mr. Catlin?

A. I believed it—I hated suing the union at the time.

Q. And you thought they had represented you properly up to that point?

A. Yeah. But you don't understand— well, go ahead.

Q. Is the answer to that yes or no?

A. At that point I really was proud of my union at that point, yeah, until I learned other things [3].

Deposition transcript, pp. 146–148.

Q. What did you say to Doc and what did he say to you?

A. Basically about the same thing I said to Jim, that I appreciated his backing me up and he helped me and—in that first grievance he helped me a lot. And he went for me.

Deposition transcript, p. 148.

Q. Anything else that you remember saying to Mr. Conders during that conversation sometime early in 1983 or late 1982?

A. I told him the same thing I told Jim: I didn't like suing the union. But I said I think we got to on the advice of my attorney or whatever.

Q. That's what I was focusing in on. When you talked about Mr. Catlin, I asked you if you made a statement to the effect that you didn't want to sue the union, but you had been advised by your attorney to sue the union in order to sue the company. And I think you told me you didn't tell that to Mr. Catlin. You told that to Mr. Conders?

A. I think I told them both.

Q. You told them both?

A. I think.

Q. What did you tell them in that regard?

A. I said I don't like—I hate suing the union. I said I think you represented me good. I hate doing this, but I don't like that decision. It was unfair as heck and I've got to carry this thing further. And I was in trouble then with my wife and everything, so I had to carry the thing further because I didn't agree with it.

Deposition transcript, pp. 150–51.

Q. But would it be fair to say, at least when the the suit was filed, December 22, 1982, the only reason you were suing Teamsters 41 was because of your law-

**3.** Based on plaintiff's testimony at pages 150–153 he is obviously referring to information he learned later about another union which had voted on whether to make a job a house account. This reference to learning something later had nothing to do with plaintiff's opinion about the representation he had received from his union.

yer's advice you had to sue the teamsters in order to get to the company?

A. Right.

Deposition transcript, pp. 153–54.

Although plaintiff's attorney had not heard about Taylor's visit to the union hall before, Taylor's testimony was entirely consistent with what Taylor had told his attorney before suit was filed.

Understandably, defendants filed motions for summary judgment based in large part on plaintiff's deposition testimony. Before opposing these motions plaintiff's attorney did not even read both defendants' suggestions in support of the motions for summary judgment. He conducted virtually no legal research in preparing his opposition to the motions. He never Shepardized his principle authority, *Baldini v. Local Union No. 1095*, 581 F.2d 145 (7th Cir. 1978). Counsel explained that he felt there was no need to Shepardize *Baldini* because he was confident it was good law. Had he Shepardized *Baldini*, certainly he would have found that later decisions in the Seventh Circuit had restricted *Baldini* to its facts.[4] Counsel did not identify by reference to the record or by affidavit any dispute of material fact. In fact he stated "Roger Taylor is not required to try his lawsuit on paper. He need not divulge the testimony of all witnesses who will be called at trial." Plaintiff's Opposition to Summary Judgment, p. 2.

In summary, Taylor's counsel recommended filing a lawsuit against these defendants without determining the easily ascertainable standard for assessing whether Local 41 had fairly represented Taylor in processing his grievance. He recommended filing suit before the events had occurred that he had to assess to determine whether Taylor had a claim. After the arbitration procedure and before the suit was filed, plaintiff's counsel again failed to ascertain the proper legal stan-

dard and to analyze what had happened in light of this standard. Instead, he attempted to create, almost out of thin air, rationalizations for filing suit. After filing suit he did nothing to determine whether the facts really supported his view that Local 41 had breached its duty of fair representation. Even after Taylor's deposition confirmed what counsel had known for some time about the union's efforts on Taylor's behalf, he blindly and stubbornly opposed the motions for summary judgment. At no time did he counsel Taylor that he should get out of this case on the best terms possible; at no time did he seek to withdraw rather than pursue the claims against Local 41 and Belger, both of which were dependent on establishing that Local 41 failed to fairly represent Taylor. See *Davidson v. Allis-Chalmers*, 567 F.Supp. 1532 (W.D.Mo.1983). Rather than analyzing the facts available to him in light of the easily ascertainable and clear legal standard for determining whether plaintiff had been fairly represented, counsel relied primarily on his emotional belief that Taylor should have gotten the job because Taylor was a good union and family man.

By so doing, plaintiff's attorney wilfully abused the judicial process and unreasonably and vexatiously multiplied the proceedings by filing and pursuing this case against Belger and Local 41. This conclusion is reached reluctantly and only after searching diligently for some reasonable basis for concluding that plaintiff's attorney met the liberal threshold standard for initiating litigation. Attorneys must be free to assert less than perfect claims on behalf of clients; attorneys must be free to assert claims where the facts and law are less than certain. Attorneys must be free to utilize discovery processes afforded by the Federal Rules of Civil Procedure to explore and develop facts to support estab-

---

**4.** See *Hoffman v. Lonza*, 658 F.2d 519 (7th Cir. 1981); *Cote v. Eagle Stores, Inc.*, 688 F.2d 32 (7th Cir.1982) (*Hoffman* and *Cote* were both decided before the complaint was filed in this case); *Graf v. Elgin, Joliet and Eastern Railway Co.*, 697 F.2d 771 (7th Cir.1983), (a Railway Labor Act case decided eleven days after the complaint was filed in this case); *Superczynski v. P.T.O. Services, Inc.*, 706 F.2d 200 (7th Cir. 1983) (decided April 19, 1983, almost two months before defendants filed their motions for summary judgment on June 14, 1983).

lished or reasonable extensions of established legal theories.

 Nevertheless, attorneys also must pursue some legal and factual analysis before subjecting a person or company to the disruption of defending a lawsuit in federal court. This analysis involves more than merely agreeing with their client's belief that an injustice has been done. As Elihu Root said " '[a]bout half of the practice of a decent lawyer is telling would-be clients that they are damned fools and should stop.' " *McCandless v. The Great Atlantic and Pacific Tea Co.*, 697 F.2d 198, 202 (7th Cir.1983). At the very least, trained attorneys who are licensed by the state owe their clients, the judicial system and the public a duty to analyze problems brought to them in light of *easily* ascertainable legal standards and to render detached, unemotional, rational advice on whether a wrong recognized by the law has been done. Attorneys should file and pursue on behalf of their clients only those cases which they reasonably believe are well grounded in fact and are warranted by existing law or a good faith argument for the extension, modification or reversal of existing law. See Missouri Supreme Court Rule 4, Disciplinary Rules DR 2–110(C) and DR 7–102(A). This duty has been summarized in the August 1, 1983, amendments to Rule 11, Federal Rules of Civil Procedure.

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harrass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including reasonable attorney's fees.

 When attorneys lose sight of this duty due to laziness, greed, incompetence, or other distracting motives, the party or parties who directly suffer from the attorney's lapse must be compensated both to make them whole and to remind other lawyers that they must continuously be aware of their professional responsibility.

### The Amount of the Attorney's Fee Award

### The Hensley Case

In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the United States Supreme Court established standards for determining the amount of a reasonable attorney's fee in all cases where Congress has authorized an award of attorney's fee to a "prevailing party."

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

> .　　.　　.　　.　　.

> The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained."

*Id.*, 103 S.Ct. at 1939–40.

The additional factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974) also may be

considered although "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley,* 103 U.S. at 1940 n. 9.

### Number of Hours Reasonably Expended in this Litigation

The affidavits submitted by Local 41 establish that the following hours were reasonably expended by Local 41's counsel, Michael Gordon, in defending this case.

| | |
|---|---|
| Affidavit dated 11/17/83 | 53.50 hours |
| Affidavit dated 2/27/83 | 24.75 hours |
| Testimony at 4/12/84 hearing | 18.00 hours |
| Total | 96.25 hours |

■ Belger's affidavit dated November 17, 1983, stated that Belger's counsel expended 125.5 hours in defense of this claim. In addition, a paralegal worked 10.25 hours on this case. Because Belger did not furnish an hourly breakdown of what was done, it is impossible to determine whether it was reasonable for Belger's attorneys to expend more time in defense of this case than Local 41's attorney. Therefore, for the purposes of this motion, 96.25 hours were reasonably expended by Belger's counsel in defense of this case.

### Reasonable Hourly Rate

#### Union

Local 41's lead counsel stated by affidavit that $60 per hour was the hourly charge for his services during the period covered by this case. Plaintiff concedes that this is a reasonable hourly rate. Therefore, the first step of the *Hensley* computation for defendant Local 41 works out as follows: 96.25 hours reasonably expended times a reasonable hourly rate of $60 = $5775.

#### Belger

■ Belger's lead counsel stated by affidavit that the hourly rates charged his client for the services of lawyers who worked on this case ranged from $85 per hour to $115 per hour. These rates are consistent with charges being made by other firms in the Kansas City area furnishing legal services to management. Neverthe-

less, the Court believes that for the purposes of this proceeding, $80 per hour would be a reasonable hourly rate.

Therefore, the first step of the *Hensley* computation for defendant Belger works out as follows: 96.25 hours reasonably expended times a reasonable hourly rate of $80 = $7700. Belger's attorneys also claim expenses in the amount of $1261.95, the reasonableness of which plaintiff does not dispute.

The Supreme Court's comment in *Hensley* that many of the *Georgia Highway Express* factors are "subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate" is certainly true in this case. Those *Georgia Highway Express* factors that are applicable to this case have been considered in the determination of the reasonable hourly rate and reasonable hours. Therefore, there will be no further adjustment to the amount claimed for the factors set forth in *Georgia Highway Express.*

### Apportionment of Fees and Expenses Between Plaintiff and His Counsel

Plaintiff hired his attorney to represent him and should share in the responsibility for counsel's actions. Had the August 1, 1983, amendments to Rule 11, Federal Rules of Civil Procedure, been in effect at the time the pleadings in this case were filed, this Court would not hesitate to require plaintiff to pay a portion of defendants' attorney's fees. Furthermore, if the statutes governing this case were the same as those in *Durrett v. Jenkins Brickyard,* 678 F.2d 911 (11th Cir.1982), part of this award would be assessed against the plaintiff personally. *See Davidson v. Allis Chalmers,* 567 F.Supp. at 1541.

■ However, in order to assess part of the damage against Taylor in this case, he must have done something more than just hire his attorney; he must have acted in bad faith in bringing or pursuing this case. Taylor did not act in bad faith or even in a manner which was tantamount to bad faith. Taylor believed that he had been wronged,

and he relied on his attorney's advice. There is no indication that Taylor testified other than truthfully at his deposition or that he did anything to prolong the processing of this case.[5] There is no evidence that his attorney urged him to discontinue the case, but he refused to do so. In short, there is no basis for concluding that plaintiff did anything other than rely in good faith on his attorney to furnish sound legal advice. Therefore, no part of the attorney's fee award will be apportioned to the plaintiff personally.

### Counsel's Financial Situation

■ The financial condition of the people against whom an award of attorney's fees is sought should be considered by the Court. *Faraci v. Hickey-Freeman Co., Inc.*, 607 F.2d 1025, 1026–27 (2d Cir.1979). The Court has attempted to obtain information on counsel's financial condition. Counsel has refused to furnish information *in camera* or otherwise about his financial condition. Although counsel says that he is a man of modest means, the Court is unable to determine what kind of adjustment should be made to the award without detailed financial information.

### Order

■ Therefore, pursuant to 28 U.S.C. § 1927, judgment is hereby granted in favor of defendant Local 41 and against Larry Kinnamon, Jr. in the amount of $5,775 and in favor of defendant Belger and against Kinnamon in the amount of $8,961.95, totaling $14,736.95.

IT IS SO ORDERED.

---

**5.** Apparently, plaintiff rejected Belger's offer of a job during the grievance procedure. Also, plaintiff rejected a settlement offer made during this case because it did not include back pay.

The record is inadequate to determine to what extent Taylor was involved in assessing these offers by his attorney's misplaced belief in the legal and factual merits of this case.