Melody PERKINS, Plaintiff,

v.

**GENERAL MOTORS CORPORATION, Defendant.**

Nos. 86–0665–CV–W–9, 87–0048–CV–W–9.

United States District Court, W.D. Missouri, W.D.

Feb. 26, 1990.

Gwen G. Caranchini, Kansas City, Mo., pro se and for plaintiff.

Michael Childs, Kansas City, Mo., for Caranchini.

Paul Scott Kelly, Jr., John J. Yates, Gage & Tucker, Kansas City, Mo., for defendant.

ORDER GRANTING IN PART AND DE-NYING IN PART DEFENDANT'S MOTION FOR SANCTIONS AGAINST PLAINTIFF AND HER LEAD ATTORNEY AND REQUIR-ING DEFENDANT TO FILE SUP-PLEMENTAL BRIEFING ON AMOUNT OF SANCTIONS

BARTLETT, District Judge.

Plaintiff Melody Perkins brought the underlying Title VII claim against General Motors Corporation (G.M.) alleging that she was the victim of both a sexually hostile work environment and quid pro quo sexual harassment. Perkins, an avowed homosexual, claimed that as a condition of her employment she was forced to have sex with Thomas Spivey, the body shop superintendent and her indirect supervisor, from shortly after she began her employment in 1978 until 1985. Her claims were resolved in the April 10, 1989, Findings of Fact, Conclusions of Law and Final Judgment.

*Perkins v. General Motors Corp.*, 709 F.Supp. 1487 (W.D.Mo.1989).

On April 13, 1989, defendant moved for sanctions in the form of reasonable attorney's fees and other expenses against Perkins and her lead counsel, Gwen G. Caranchini,[1] citing seven particular instances of conduct by Perkins and/or Caranchini that it believes warrant sanctions under 28 U.S.C. § 1927 and Rules 11 and 26(g), Federal Rules of Civil Procedure, or some combination of these. Shortly before defendant's motion was ready to rule, separate counsel, Michael Childs, entered an appearance on behalf of Caranchini and filed further opposition to the Motion for Sanctions against Caranchini. By June 20, 1989, defendant's motion was fully briefed. A hearing on defendant's motion was set for July 14, 1989, "to ensure that each party has ample opportunity to present all *facts* in support of and in opposition to the motion...." (Emphasis added.)

On July 12, 1989, Caranchini notified me that, upon advice of her attorney, she would not represent Perkins at the July 14, 1989, hearing and that she believed Perkins desired to proceed *pro se* at the hearing. I contacted the other attorneys who had entered appearances on Perkins' behalf to ensure that they were aware of their responsibilities to Perkins. They told me that they were unable to work out satisfactory arrangements and, therefore, Perkins would represent herself. At the July 14, 1989, hearing, Perkins stated that, given Caranchini's refusal to represent her, Perkins wished to proceed *pro se* because she could not afford to hire another lawyer. Thus, at the July 14, 1989, hearing, Caranchini was represented by Childs and Perkins appeared *pro se.*

I. *Standards for Imposing Sanctions*

### A. 28 U.S.C. § 1927

Title 28 U.S.C. § 1927 provides that:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

(1989 Supp.)

Section 1927 requires that the attorney act either in subjective bad faith or that the conduct itself be objectively vexatious. *Burull v. First National Bank*, 831 F.2d 788, 790 (8th Cir.1987). Sanctions under § 1927, unlike those under Rule 11, are discretionary, not mandatory. *Id.*

Sanctions under § 1927 have been held appropriate in a variety of circumstances. *See, e.g., Taylor v. Belger Cartage Service, Inc.*, 102 F.R.D. 172 (W.D.Mo.1984) (union member's attorney unreasonably and vexatiously multiplied proceedings by filing and pursuing the case); *Fisher v. CPC International Inc.*, 591 F.Supp. 228 (W.D.Mo. 1984) (all amounts incurred by defendants recoverable as excess costs under § 1927 where action never should have been filed and counsel for plaintiff proceeded recklessly).

### B. Rule 11

Rule 11, Federal Rules of Civil Procedure, which applies to pleadings, motions and other papers, provides:

The signature of an attorney or party constitutes a certificate by the signer that the signer has read the *pleading, motion, or other paper;* that to the best of the signer's knowledge, information, and belief formed *after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.* ... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a

---

**1.** G.M. does not seek sanctions against any of the other attorneys who entered their appearance for plaintiff.

represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

*Id.* as amended April 28, 1983, effective August 1, 1983 (emphasis added).

The Advisory Committee Note to Rule 11 clarifies the purpose of the amendment:

Since its original promulgation, Rule 11 has provided for the striking of pleadings and the imposition of disciplinary sanctions to check abuses in the signing of pleadings.... Experience shows that in practice Rule 11 has not been effective in deterring abuses.... *The new language is intended to reduce the reluctance of courts to impose sanctions, by emphasizing the responsibilities of the attorney and reinforcing those obligations by the imposition of sanctions.*

Rule 11 Advisory Committee Note, 97 F.R.D. 165, 198 (1983) (citations omitted) (emphasis added).

Rule 11 is "intended to be vigorously applied by district courts to curb widely acknowledged abuse resulting from the filing of frivolous pleadings and other papers." *Adduono v. World Hockey Ass'n.*, 824 F.2d 617, 621 (8th Cir.1987).

Under Rule 11, the signature of a party or attorney constitutes a certificate that the signer believes that after reasonable inquiry, 1) the pleading is well grounded in fact; 2) the pleading is warranted by existing law; and 3) the pleading is not presented for any improper purpose.

■ The party or his attorney need not act in subjective bad faith or with malice to trigger a violation of Rule 11. *Adduono*, 824 F.2d at 621. Rather, an objective standard applies and the party or his attorney cannot argue "that their subjective 'good faith' (*i.e.*, ignorance of the law or legal procedures) somehow excuses their actions." *Kurkowski v. Volcker*, 819 F.2d 201, 204 (8th Cir.1987). The 1983 revision to Rule 11 "was designed to prevent abuse caused not only by bad faith but by negligence and, to some extent, by professional incompetence." *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir.1987); *see* Rule 11 Advisory Committee Note, 97 F.R.D. at 198. "The standard is one of *reasonableness under the circumstances.*" Rule 11 Advisory Committee Note, 97 F.R.D. at 1 98 (emphasis added).

The Advisory Committee Note sets forth, and the case law has further clarified, the factors a district court should consider in determining whether the attorney made a reasonable inquiry into the facts of a case:

[W]hether the signer of the documents had sufficient time for investigation; the extent to which the attorney had to rely on his or her client for the factual foundation underlying the pleading, motion, or other paper; whether the case was accepted from another attorney; the complexity of the facts and the attorney's ability to do a sufficient prefiling investigation; and whether discovery would have been beneficial to the development of the underlying facts.

*Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1435 (7th Cir.1987); *see* Rule Advisory Committee Note, 97 F.R.D. at 199.

■ Sanctions may be warranted under the "improper purpose" clause even if a competent attorney could form a reasonable belief as to the viability of the original complaint. If, for instance, the conduct of the litigation is "frivolous and abusive and not directed toward the 'just, speedy and inexpensive determination of [the] action,'" sanctions are appropriate. *Bastien v. R. Rowland & Co.*, 116 F.R.D. 619, 621 (E.D. Mo.1987), *aff'd*, *Lupo v. R. Rowland & Co.*, 857 F.2d 482 (8th Cir.1988); *see also Lucha, Inc. v. Goeglein*, 575 F.Supp. 785 (E.D.Mo.1983).

■ Once the court has found a Rule 11 violation, imposition of sanctions is mandatory. *See Adamson v. Bowen*, 855 F.2d 668, 672 (10th Cir.1988); *Wise v. Pea Ridge School District No. 109*, 675 F.Supp. 1524 (W.D.Ark.1987), *aff'd*, 855 F.2d 560 (8th Cir.1988).

### C. Rule 26(g)

Rule 26(g), Federal Rules of Civil Procedure, which applies to discovery requests,

responses to requests and objections to requests, provides:

> The signature of the attorney or party constitutes a certification that the signer has read the request, response, or objection, and that to the best of the signer's knowledge, information, and belief formed after a reasonable inquiry it is: (1) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation. . . .
>
> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

Rule 26(g), as amended April 28, 1983, effective August 1, 1983. The Advisory Committee Note describes the purpose of the rule:

> Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions. The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection.

> . . . . .

> Although the certification duty requires the lawyer to pause and consider the reasonableness of his request, response, or objection, it is not meant to discourage or restrict necessary and legitimate discovery. The rule simply requires that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection.

> The duty to make a "reasonable inquiry" is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11. See the Advisory Committee Note to Rule 11. In making the inquiry, the attorney may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances. Ultimately what is reasonable is a matter for the court to decide on the totality of the circumstances.

> Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request. Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.

> Thus, the lawyer's certification under Rule 26(g) should be distinguished from other signature requirements in the rules, such as those in Rules 30(e) and 33.

> . . . . .

> Because of the asserted reluctance to impose sanctions on attorneys who abuse the discovery rules, Rule 26(g) makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it. This authority derives from Rule 37, 28 U.S.C. § 1927, and the court's inherent power. The new rule mandates that sanctions be imposed on attorneys who fail to meet the standards established in the first portion of Rule 26(g). The nature of the sanction is a matter of judicial discretion to be exercised in light of the particular circumstances.

(Citations omitted.)

## II. *Background*

Defendant's motion must be considered against the background of pretrial and trial

behavior of plaintiff and her counsel. Plaintiff's counsel seemed obsessed with converting a straightforward Title VII claim with unusual facts into a war against defendant and its attorneys. Her obsession led her to engage in personal, emotional attacks on opposing counsel.[2]

During discovery, the inability of counsel to work together in processing this case resulted in numerous conferences both by telephone and in person to resolve what at the time often seemed to be frivolous disputes.[3]

Over time I realized that plaintiff's counsel bore the lion's share of the responsibility for the tension between counsel. Plaintiff's cause and the judicial system would have been far better served had the energy that went into these disputes between counsel been invested in focused, factual investigation directed to well conceived legal theories.

In summary, the approach of plaintiff's attorney to this case exceeded the most generous definition of "zealous advocacy" or of "hard fought, energetic and honest representation." Rather than devoting her

efforts to the "just, speedy, and inexpensive" determination of this case, plaintiff's counsel engaged in abusive litigation tactics that delayed the processing of the case and increased the expense for both parties and the judicial system.

### III. Sanctions Will Be Imposed Against Perkins and Caranchini Under Rule 26(g) and Against Caranchini Under § 1927 for Persisting in Pressing Factually Unsupported Allegations Against Art Hester and for Doing So for an Improper Purpose

Caranchini took the deposition of Art Hester, the G.M. Fairfax production manager, on September 3, 1987.

According to defendant's counsel (and not disputed by Caranchini), Caranchini telephoned counsel for G.M. on September 9, 1987, stating that her investigation following the deposition had determined that Hester had been "drummed" out of the United States Army based on allegations of sexual harassment and that he was allowed to resign his commission rather than be discharged. On September 11, 1987, Caranchini wrote a letter to G.M.'s counsel

---

**2.** One recorded example of Caranchini's behavior is the following excerpt from a letter dated March 13, 1988, from Caranchini to Kelly and Yates, defendant's attorneys:

> Yet despite this record (or absence of record to support your positions), you and your client continue your always arrogant and ignorant posturing that Ms. Perkins is lying or hallucinating or both causing not only delay in the processing of this litigation but increasing the stress on this poor woman and her spouse.... Despite the posturing of Ms. McNamara—who I can only describe as an inept, could [sic] blooded women [sic] who mouths what she hears from both of you—
>
> . . . . .
>
> I, therefore, urge you both to consider your ethical obligations, even if they are at cross purposes with Gage & Tucker's financial interests, or the interests of your client, in continuing to attempt to discredit Ms. Perkins and unduly prolong this litigation.
> Quite frankly, I don't expect a response in terms of settlement. I do expect to receive one of Jack's all too pompous and arrogant letters which this office has learned to laugh at and use as a model of what not to aspire to in letter writing skills....

At the hearing on G.M.'s Motion for Sanctions, Caranchini agreed that she was emotionally involved in this case because it involved an

emotional "women's issue." She stated that she "liked her emotions;" they "don't make me a bad attorney."

A genuine belief in the righteousness of a client's cause can benefit a client. However, clients are not well served by attorneys who become so emotionally involved that they lose their ability to present effectively a client's cause. When emotion controls, distracts and substitutes for legal analysis and factual development, the client and the legal system are ill-served. Professional advice and objectivity are an attorney's stock in trade; emotional cheerleaders are a dime a dozen.

**3.** For example, because so many problems arose out of plaintiff's deposition, I required that the deposition be completed in chambers. I hoped that the location of the deposition plus my availability to resolve disputes would reduce the nonsense.

Generally, when disputes arose, I chose to push discovery to completion rather than attempt to make determinations of relative fault as we went along. I was concerned about aggravating the situation and making the case even more protracted and expensive. At times, I even suggested that possibly both parties were at fault in an effort to move forward and quiet the emotion-charged atmosphere.

stating that "[it] has come to my attention Art Hester's departure from the military may have been the result of claims of sexual harassment against him, and/or as a result of his inability and unwillingness to deal with women subordinates." Exhibit F to defendant's motion for sanctions at 1.

Caranchini continued to make references to Hester's alleged sexual misconduct until trial. For example, in her June 8, 1988, letter to G.M.'s counsel, Caranchini stated: "We are entitled to know whether Mr. Hester was engaged in sexual relations with Ms. Clark during the time she was in personnel.... Likewise any memorandums in either of these individuals' personnel files regarding their 'affair.'" Exhibit G at 2. In an October 14, 1988, letter, Caranchini warned: "Those individuals who you have indicated in the last several weeks you may call as witnesses also for the most part have serious background problems and will be subjected to some brutal cross examination." Exhibit E at 3. Implicit in this letter is the threat to make public plaintiff's charges against Hester of sexual misconduct.

On March 2, 1988, in response to defendant's interrogatory requesting information on plaintiff's contention that G.M. hired people "known to GM to have a lack of interpersonal relationship skills with women in the work place," Perkins stated under oath:

1) General Motors hired Arthur Hester as Fairfax plant manager when they knew he had significant problems with the United States Army over his sexual harassing women during his service in the Army, G.M. continues to retain him despite allegations by his wife and other individuals of his sexual escapades with women at the plant.

Exhibit H, answer to Interrogatory No. 10.

On October 28, 1988, Perkins stated under oath in an interrogatory answer that Hester was among "the particular managers of whom plaintiff has knowledge sexually harassing female employees." Exhibit I, answer to Interrogatory No. 8. On the same date, Perkins stated under oath that Hester "engages in sexual harassment at the plant, receives sexual favors from men at the plant, and sexually harassed when in the Army which caused him to resign from the service." Exhibit J, answer to Interrogatory No. 9.

Finally, at trial, Caranchini asked Timothy Danahy, personnel director at Fairfax, if he had received an anonymous letter containing allegations that Hester had an affair with Cinda Clark, another G.M. employee. Caranchini said that she wanted to show the "perception" of General Motors employees that a female employee had to "sleep her way to the top." G.M. objected arguing that these matters were irrelevant. I overruled G.M.'s objection based on Caranchini's representation that later witnesses would establish a proper basis for the question.

G.M. seeks sanctions against Perkins and Caranchini under Rule 26(g) alleging that the interrogatory responses were signed without a reasonable basis in fact and for improper purposes and against Caranchini under § 1927 for pursuing the attack on Hester for improper purposes.

Caranchini and Perkins argue that the "continual rumors about Mr. Hester's involvement with women" were substantiated by Fred White, Jr., Benjamin Staponski, Kathy Tierney and Trudy Lomonoco. Plaintiff's May 12, 1989, Response to Defendant's Motion for Sanctions at 17. They point to Ms. Howell's trial testimony that Hester would regularly tell her when he left the building during office hours that if his wife called, Howell was not to tell her that he had left the building.

Caranchini states that she requested that defendant produce Hester for a limited additional deposition so that she could inquire about these matters but that G.M. refused to produce him. Caranchini and Perkins argue that G.M.'s refusal made G.M. "as responsible for this information going to trial as anyone." Response at 18. However, Caranchini never brought to my attention her desire to take a limited additional deposition of Hester on this issue. In a case where so much time was spent with counsel resolving discovery disputes, plaintiff's failure to raise with me her desire to

redepose Hester establishes a lack of interest in investigating the truth of the alleged rumors.

Both Caranchini and Perkins now maintain that "the importance of the information regarding Mr. Hester is what was *perceived* by women and others at the plant regarding his sexual conduct, not what was actual fact." Response at 18 (emphasis added). If all that mattered was the "perception" of Hester's alleged sexual harassment and extra-marital activities, Caranchini would have had no reason to request that G.M. produce Hester for his deposition on the subject. Furthermore, Perkins' responses to the interrogatories do not state that she is just repeating rumor. Also, no evidence was presented that Perkins was aware of the rumors concerning Hester's departure from the military during the time she was allegedly experiencing a hostile environment. *See* Caranchini's September 11, 1987, letter to G.M.'s counsel (Exhibit F) in which she states that "information [about the circumstances surrounding Hester's departure from the military] has only come to light since the completion of his deposition." Finally, Caranchini did not question Danahy at trial about whether Hester was perceived as a "womanizer"— she asked what *facts* Danahy knew about the issue.

 Plaintiff and her attorney never produced any factual basis to support their personal attack on Hester. Caranchini failed to conduct an objectively reasonable inquiry into the charges made against Hester in interrogatory answers. Accordingly, I conclude that the allegations against Hester were intended to harass Hester and to increase the cost of this litigation for defendant.

Perkins signed the interrogatory answers. Caranchini signed them under the words "respectfully submitted." Therefore, because the interrogatory answers pertaining to Hester were "interposed" for an "improper purpose," both Perkins and Caranchini violated Rule 26(g).

Caranchini's actions in pursuing the charges against Hester without adequate investigation multiplied the proceedings un-reasonably and vexatiously in violation of § 1927.

Therefore, Caranchini and Perkins will be required to reimburse G.M. for its reasonable expenses, including attorney's fees incurred in investigating the claims, preparing to respond to the charges against Hester at trial, preparing the Motion in Limine on this issue and participating in that part of the trial pertaining to those charges. Seventy-five percent of these expenses will be assessed against Caranchini and the balance against Perkins.

## IV. *G.M.'s Second Basis for Sanctions Will be Ruled in a Separate Order*

All briefing on G.M.'s second basis for sanctions was filed under seal pursuant to the January 4, 1988, protective order. Therefore, the order ruling this ground for sanctions will be issued separately under seal.

## V. *Sanctions Will be Imposed Against Caranchini Under Rule 11 for Making Factual Misrepresentations in Plaintiff's November 23, 1987, Motion for Leave to Amend Complaints*

 On May 27, 1986, Perkins filed suit in this court against G.M. alleging that G.M. negligently failed to maintain a safe work place free of sexual harassment (case No. 86–0665, "the negligence case"). On November 3, 1986, the negligence case was stayed pending adjudication of Perkins' worker's compensation claim in Kansas.

On May 28, 1986, (the next day) Perkins filed suit in Jackson County Circuit Court against Spivey alleging assault, battery and intentional outrageous conduct (the "state court case").

On January 20, 1987, plaintiff filed her second suit in this court against G.M. alleging sexual harassment in violation of Title VII ("the Title VII case").

On February 24, 1987, plaintiff's two federal cases were consolidated on *defendant's* motion and the stay in 86–0665 was lifted.

On September 2, 1987, a scheduling conference was held at which Caranchini represented that no amendments to the plead-

ings or parties would be forthcoming. Accordingly, the September 14, 1987, scheduling order governing both cases in federal court stated that "no motion to join additional parties will be filed and no motion to amend the pleadings will be filed."

On November 23, 1987, Perkins filed a motion in the consolidated cases for leave to amend the complaints, to add Spivey as a defendant in the negligence case and to add a claim for retaliatory discharge in the Title VII case. In her suggestions accompanying this motion, Caranchini stated that:

> At the time of the filing of [the state] lawsuit Thomas Spivey was a citizen of Missouri and therefore could not be joined in the lawsuit filed against G.M.
>
> . . . . .
>
> Until the recent deposition of Spivey in the Federal case, which is not transcribed as of this date, it was not known that Spivey was no longer a resident of Missouri. Counsel for Perkins has only very recently been apprised by Spivey's counsel that Spivey is moving to Detroit, Michigan for a new job with G.M. [I]t was unclear until recently whether complete diversity would be preserved giving [sic] the unknowns about Spivey's residence. That problem has ... been resolved.

Suggestions at 2, 4–5, 7.

Caranchini's statements regarding when she learned about Spivey's change of residence were incorrect. In the negligence case filed May 26, *1986*, plaintiff alleged: "7. Thomas S. Spivey has been transferred to the Lakewood Plant of GM in the environs of Atlanta, Georgia, effective June 1, 1986." This fact was confirmed in the October 30, 1986 deposition of Spivey:

> Q. (By Caranchini) And where do you presently maintain your residence?
> A. 5838 Trent Walk Drive.
> Q. Could you spell that, please?
> A. T-r-e-n-t, W-a-l-k, two words, Decatur, Georgia 30038.
>
> . . . . .
>
> Q. Do you maintain any other residence in any other states?

> A. What do you mean by "maintaining a residence?"
> Q. Do you have a home in any other state, a second home?
> A. My wife has a home.
> Q. And where does your wife reside?
> A. In Leawood, Kansas.
> Q. Do you not live together?
> A. We do not live together.

Exhibit D to G.M.'s December 7, 1987, Motion to Strike Plaintiff's Motion for Leave to Amend at 4.

In her May 12, 1989, opposition to G.M.'s motion for sanctions, Caranchini asserts without support that:

> [J]ust because Mr. Spivey was transferred to Lakewood, Georgia doesn't mean that he became a resident there. In fact, it appears that Mr. Spivey continued to be maintained on the roles [sic] of the employees of Fairfax even as late as July of 1988 and that he maintained as his residence, either his Gladstone address in Missouri or his wife's address at one point in time in Leawood, Kansas.

I have given Caranchini an opportunity to present the factual basis that she relies on for these statements but she has failed to present anything to support them. The only reasonable conclusion remaining is that she made an affirmative misrepresentation in her November 23, 1987, Motion to Amend when she stated she had "only recently discovered" that Spivey was no longer a resident of Missouri.

At the scheduling conference held on December 17, 1987, Caranchini offered other explanations for seeking to amend after the deadline. After I responded that Caranchini's reasons made little sense, Caranchini conceded that the real reason for seeking the late amendment was a change in strategy, not the reasons she advanced in the motion. Exhibit M to Defendant's Motion for Sanctions at 31.

(A change in strategy, the real reason Caranchini sought a late amendment, is a legitimate reason for requesting leave to amend after a scheduling order deadline has passed. Had the real reason been given by Caranchini, she would have been true

to her oath as an attorney and her duty under Rule 11 even if the motion had been denied.)

In addition, sanctions against Caranchini are appropriate under § 1927. By misrepresenting the reasons why the relief she requested should be granted, Caranchini unreasonably and vexatiously multiplied the proceedings. Both my time and defense counsel's time were wasted in considering the spurious reasons given for plaintiff's motion.

Furthermore, Caranchini has not explained why her request to add the retaliation claim when it had not been presented to the EEOC complied with her duty under Rule 11. However, because some courts do not require amending an EEOC charge to assert retaliation, Caranchini will not be sanctioned for seeking leave to add this claim without first presenting it to the EEOC.

Accordingly, Caranchini will be required to pay to G.M. its reasonable expenses incurred, including attorney's fees for 1) responding to plaintiff's November 23, 1987, Motion for Leave to Amend Complaint to add a party defendant; and 2) attending and preparing for that portion of the December 17, 1987, conference devoted to considering plaintiff's attempt to add a party defendant. No sanctions will be imposed on Perkins.

VI. *Sanctions Will be Imposed Against Caranchini Under § 1927 and Rule 26(g) for Improper Handling of Fred White, Sr.'s Discovery*

■ Fred White, Sr., was a member of upper management at G.M. Fairfax, who retired in August 1987, after a lengthy career with G.M. During the trial, Caranchini called White, Sr., as a witness for plaintiff and asked him whether he believed Perkins had been sexually harassed by Spivey. G.M. objected to this and related questions claiming unfair surprise. Caranchini represented that White, Sr., if permitted, would testify that he believed Perkins because she had come to him complaining

about Spivey and he had investigated her allegations.

On December 1, 1988, after 19 days of trial, I held a full day hearing at which lead counsel for both plaintiff and G.M. testified on the issue of whether the testimony of White, Sr., came as a surprise to G.M. At the conclusion of the hearing, I concluded that plaintiff had failed to reveal White's name in response to discovery requests, that to allow White to testify would be unfair and that plaintiff's request to reopen discovery after 19 days of trial would be denied. G.M. has now moved for sanctions against both Caranchini and Perkins for providing inaccurate and incomplete responses to G.M.'s interrogatories and against Caranchini for vexatiously multiplying the proceedings.

On June 19, 1987, Caranchini took White, Sr.'s, deposition. On July 1, 1987, Caranchini wrote G.M.'s counsel accusing G.M.'s counsel of pressuring White, Sr.

> Likewise through Fred White, Jr. we understand Fred White, Sr., was pressured by G.M. to give the testimony he did in this case. If he did not give the testimony desired, it was made clear to him his early retirement was in jeopardy.... In fact, after Fred White, Jr.'s deposition was finished, Scottie went into the room in which Fred White, Sr., was waiting and informed him his son had just "unloaded" on the company and insinuated again Fred White, Sr., better watch what he said. As I was not in the room, I am unaware of the exact words conveyed to Fred White, Sr., Fred White, Sr., conveyed to Fred White, Jr. who conveyed to the undersigned the fact that Fred White, Sr., was being told he better play ball with the company "or else." [4]

A few days later Kelly took a recorded statement from White, Sr., in which he denied giving false testimony and denied being pressured.

By her own admission, Caranchini believed no later than January 1, 1988, that

---

**4.** Fred White, Jr., was a client of Caranchini who was suing G.M. at the time. "Scottie" is

Paul Scott Kelly, one of G.M.'s attorneys.

White, Sr., had information about Perkins' allegations that he would eventually disclose to Caranchini and that it would be helpful to Perkins. *Id.* at 147. Caranchini thought that White, Sr.'s, information was very important. "Oh, I thought it was a very important piece of information, but if I couldn't get him to say it, I felt there was nothing to do about it. I can't force him to give me information if he doesn't want to give it to me." *Id.* at 156.

When Caranchini asked White, Sr., about whether he had answered truthfully questions at his deposition about Perkins, White, Sr., "told me that he answered the questions truthfully in his deposition but that I had not asked the right questions." *Id.* at 131. When Caranchini asked him what the right questions were, White, Sr., responded, according to Caranchini, that "we at General Motors are taught to answer the question. When you get the right question you will get the right answer." *Id.* In late summer or early fall of 1988, White, Jr., told Caranchini that she was still not asking White, Sr., the right questions "and that his father had information...." *Id.* at 132. At a lunch with White, Sr., in late September or early October 1988, Caranchini testified that White, Sr., "said once again that he believed Perkins." *Id.* Caranchini asked White, Sr., if he had more specific information and he again said that if the right question were asked, he would give "the right answer." *Id.* at 133. On the night before White, Sr., was going to testify, White, Sr., and Jr., came to Caranchini's office. White, Jr., volunteered to ask the right question of his father which turned out to be "why do you believe Melody Perkins?" White, Sr., responded that Perkins had complained to him and he had made an investigation. *Id.* at 133–34.

Caranchini made no effort to depose White, Sr., to attempt to ask this obvious "right question." (In fact, the question is so obvious it supports the conclusion that Caranchini knew a good deal more about what White, Sr., had to say than she now suggests.)

Also, Caranchini did not list White, Sr.'s, name in response to G.M.'s second interrogatories to plaintiff:

7. Do you contend that General Motors had actual knowledge that Tom Spivey "sexually harassed" and "raped" plaintiff as is alleged in plaintiff's complaints? If ... the answer to this interrogatory is in the affirmative, identify by name and job title each employee of G.M. plaintiff contends had such knowledge and when such knowledge was acquired by that employee and state separately each and every fact upon which you base your contention.

(a) identify by name, job title or position and address each person *known or believed by plaintiff to have knowledge* of each fact recited in response to this interrogatory.

. . . . .

8. In addition to any claim of actual knowledge reflected in response to interrogatory 7 above, do you contend that General Motors should have known that Tom Spivey "sexually harassed" and "raped" plaintiff as is alleged in plaintiff's complaints? If the answer to this interrogatory is in the affirmative, identify each employee of G.M. plaintiff contends should have known of such conduct and the date upon which plaintiff contends each such employee should have known of such conduct, and state separately each and every fact upon which you base your contention.

(a) Identify by name, job title or position and address each person known or believed *by* Plaintiff *to have knowledge* of each fact recited in response to this interrogatory.

(Emphasis added.) *See* Plaintiff's September 14, 1987, Answers to G.M.'s Second Interrogatories, Exhibit P to G.M.'s April 13, 1989, Motion for Sanctions; Plaintiff's March 8, 1988, Second Supplemental Answers, Exhibit R; and Plaintiff's October 28, 1988, Third Supplemental Answers, Exhibit S.

Caranchini claims that because she had no actual knowledge of White Sr.'s, alleged investigation until the revelation the night

before trial, she had no obligation to furnish White, Sr.'s, name to G.M. in response to interrogatories. When asked at the hearing by counsel for G.M. why she did not take White, Sr.'s, deposition, she stated that: 1) White, Sr., stated that he preferred that she not ask him any further questions about Perkins because it would require him to testify against G.M. and at that time he was not willing to do so, Exhibit N at 122; 2) she was convinced that she could not get anything out of White, Sr., unless he wanted to give it to her, *id.* at 130; and 3) because she felt that if she waited, sooner or later White, Sr., would come to her and give her the information. *Id.* at 148.

As I concluded at the December 1, 1988, hearing, Caranchini believed by early 1988 that White, Sr., had very significant information favorable to plaintiff. Because of White, Sr.'s, upper management position at G.M., his testimony could have a devastating effect on defendant's case. Nevertheless, Caranchini did not reveal White, Sr.'s, name in response to interrogatories that clearly asked for the name of every G.M. employee that plaintiff believed had knowledge that could be imputed to G.M. (Caranchini's argument that she revealed White, Sr.'s, name in response to other interrogatories does not absolve her from violating her duty to answer all discovery completely and truthfully).

I am convinced that Caranchini and the plaintiff intentionally did not furnish White, Sr.'s, name in response to the crucial interrogatories and intentionally did not amend their answers to interrogatories 7 and 8 before trial in order to surprise G.M. at trial. (Although Perkins repeatedly supplemented her discovery responses in various respects after she knew enough to form the belief that White, Sr., had important and favorable information, she never identified White, Sr., in response to appropriate questions before trial. *See* Exhibit N at 161–63 and Exhibits P, Q, R and S to defendant's Motion for Sanctions.)

Accordingly, Caranchini and Perkins violated Rule 26(g) in that they signed discovery responses that were not consistent with the Federal Rules of Civil Procedure because they were not complete and accurate. They will be ordered to pay defendant's reasonable expenses incurred because of this violation including reasonable attorney's fees. (The record in this case amply supports the conclusion that Perkins knew that Caranchini believed White, Sr., had significant information that would be of great assistance to plaintiff's case. Caranchini and Perkins worked closely together throughout this case. It defies belief that Caranchini would not have made Perkins fully aware of the important witness that Caranchini believed she had in White, Sr.

Also, Caranchini will be sanctioned under § 1927 for unreasonably and vexatiously multiplying the proceedings. She will be assessed the excess costs and attorney's fees reasonably incurred because she unreasonably did not disclose White, Sr.'s, name in answer to Interrogatories 7 and 8 resulting in a multiplication of the proceedings.

Accordingly, because of her violation of 28 U.S.C. § 1927 and Rule 26(g), Caranchini will be required to pay G.M. its reasonable expenses including attorney's fees incurred for 1) time spent in court on November 10, 1988, concerning the intended testimony of White, Sr.,; 2) time spent on G.M.'s Motion in Limine regarding the testimony of White, Sr.,; and 3) time spent preparing for and at the December 1, 1988, hearing, on the Motion in Limine. Perkins will be assessed 15 percent of G.M.'s reasonable expenses for knowingly answering untruthfully and incompletely the interrogatories.

VII. *Sanctions Will Not Be Imposed Against Caranchini Under § 1927 for Proffering Plaintiff's Social Work Expert*

■ At trial, Caranchini called Karen C. Wagner, an experienced social worker with an extensive background in women's issues, and attempted to qualify her as an expert. In plaintiff's March 7, 1988, Third Supplemental Answers to Defendant's First Interrogatories to Plaintiff (Exhibit T to G.M.'s April 13, 1989, Motion for Sanctions), plaintiff named Wagner as an expert to testify to the following: 1) her definition of sexual harassment based on a layman's

understanding of the EEO guidelines; 2) that an environment such as the one at G.M. Fairfax has an adverse impact on female employees; 3) that there are specific steps that employers can take to create an environment free from sexual harassment which G.M. failed to take; 4) that Perkins experienced sexual harassment and G.M. management was unresponsive to her concerns; 5) that G.M.'s approach to allegations of sexual harassment causes women to believe that a) their allegations will not be believed, b) nothing will be done to correct the sexual harassment at Fairfax; and/or c) they will be retaliated against for complaining; and 6) that homosexual women often hide their homosexuality from co-workers because this knowledge is often used against them.

After G.M. informally advised plaintiff that G.M. believed many of the subjects Wagner was planning to testify about were improper, G.M. filed two Motions in Limine on October 17, 1988, regarding Wagner: 1) a motion to exclude expert opinions on credibility; and 2) a motion to exclude Wagner's testimony entirely because it lacked a reliable and unbiased foundation and because it consisted of inadmissible legal conclusions.

During the pretrial conference I made clear to both parties that no *witness* would be permitted to testify about the law on sexual harassment. However, I reserved ruling on the motions until I could hear Wagner's qualifications and hear the questions plaintiff's counsel would ask Wagner.

Caranchini called Wagner at trial and spent an entire day attempting, unsuccessfully, to qualify her as an expert on these issues. Later in the trial, when Wagner did not reappear, Caranchini moved to strike Wagner's testimony in its entirety.

G.M. moves for sanctions against Caranchini under § 1927 alleging that her persistence in attempting to qualify Wagner as an expert to testify about matters that were improper unreasonably and vexatiously multiplied both the discovery and trial proceedings.

Caranchini contends that sanctions are not appropriate because, although I refused to allow Wagner to testify on these issues, Wagner has been qualified as an expert witness on substantially similar issues in other cases. Thus, Caranchini argues that she had no reason to believe that she could not qualify Wagner in this case. In support of this contention, Caranchini provided a portion of the trial transcript from *Moffett v. Gene B. Glick Co.*, 621 F.Supp. 244 (N.D.Ind.1985), and portions of Wagner's deposition in that case in which Wagner discusses generally her experience as a consultant and expert witness. The most significant portion of the *Moffett* transcript is at pages 283–84 where the court qualified Wagner as an expert on specific issues after hearing her testimony about her experience counseling victims of sexual harassment:

The Court: She's testified primarily about the *effects of harassment on individual workers and the appropriate response for employers to make* to activities of harassment; and with respect to the matters about which I understand her to have testified, it's absolutely clear to me that she is an expert.

Now the question of what weight I give to her testimony on the various issues in the case or whether I, in fact, find that the plaintiff will prevail under various theories is entirely a different matter; but as I understand the matters that she has testified to, that is, the impact of harassment on the job on individual employees and the appropriate response that employers should make to harassment on the job, primarily sexual in her testimony.... I think she's clearly qualified to testify about the matters that I understand her to have testified to.

⋅ ⋅ ⋅ ⋅ ⋅

I think her expertise is established generally with respect to harassment on the job site, primarily sexual harassment and the effects of that on employees and the method of appropriate response by employers.

Mr. James F. Beatty: Thank you.

The Court: *And I would only consider her testimony on those issues.*

(Emphasis added.)

Although Wagner has acted as a consultant or a non-testifying expert in other

cases, she was only qualified to testify at trial as an expert in one other case—*Broderick v. Ruder,* 685 F.Supp. 1269 (D.D.C. 1988). Wagner's February 12, 1988, deposition, Vol. II at 165. In her deposition, Wagner was asked:

> Q. And what was the opinion you were asked to give in [the Broderick] case?
> A. The opinion was the kind of hostile environment that the individual experienced, and the kind of retaliation she experienced as a result of not acquiescing, to that hostile environment.
> Q. And what was your testimony in that case?
> A. That she, in fact, experienced a hostile, environment, and, in fact, experienced retaliation because of her unwillingness to acquiesce to that environment.

*Id.* at p. 166, 11. 1–11.

In the *Broderick* opinion, Wagner's testimony was referred to as follows:

> Ms. Karen Wagner, a social worker with broad experience, was the plaintiff's other expert. She testified generally on the stress *effects of sexual harassment on women in plaintiff's position, with particular reference to the plaintiff's hostile working environment* and its effect on the plaintiff and her associates in having to work in such an environment.

685 F.Supp. at 1273 (emphasis added). The opinion does not state whether Wagner's opinion about the stress effects was based on a hypothetical question or whether Wagner was qualified to opine on whether plaintiff had in fact been subjected to a sexually hostile work environment.

Caranchini argues that my failure to grant the Motions in Limine was the real cause of the entire day being wasted while Caranchini tried to qualify Wagner. As I made clear on the record, I was skeptical about whether Wagner could be qualified to give any relevant testimony but decided to give plaintiff the opportunity to try.

Although Caranchini's day long attempt to qualify Wagner as an expert was, in retrospect, a waste of time, I am not convinced that Caranchini unreasonably or vexatiously multiplied the proceedings. Caranchini had reason to believe that Wagner would be qualified as an expert on at least some of the issues and neither her refusal to withdraw Wagner in response to G.M.'s concerns nor her attempts at trial to qualify Wagner as an expert warrant § 1927 sanctions. Accordingly, no sanctions will be imposed upon Caranchini for proffering plaintiff's social work expert.

VIII. *Sanctions Will be Imposed Against Caranchini Under § 1927 for Misrepresenting Plaintiff's Evidence Regarding Work Environment Witnesses*

■ Perkins claimed that she was a victim of both quid pro quo sexual harassment and a sexually hostile work environment. At trial, Caranchini called numerous witnesses from the G.M. Fairfax plant to testify about their perception of the work environment and about sexual harassment directed at them. G.M. objected to the relevancy of the experiences of these witnesses because there was no evidence that Perkins was aware of their experiences or that their work environment was the same as plaintiff's. Caranchini argued that the testimony of the work environment witnesses was relevant to establish the ineffectiveness of G.M.'s overall complaint procedure and the generally hostile environment.

G.M. moves for Rule 11 and Rule 26(g) sanctions against Caranchini and Perkins for listing witnesses in interrogatory answers and witness lists who had no personal knowledge of facts relating to Perkins' claim. G.M. argues that this action demonstrates an inadequate factual inquiry by Perkins and Caranchini and an improper purpose that needlessly increased the costs of litigation.

Caranchini and Perkins oppose entry of sanctions arguing that they had a good faith belief that I would permit witnesses to testify about the general sexually hostile work environment in light of the unsettled case law on this issue. Specifically, Caranchini and Perkins rely on *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir. 1987).

*Hicks* was cited in *Hall v. Gus Const. Co.,* 842 F.2d 1010, 1015 (8th Cir.1988), for the proposition that "evidence of sexual

harassment directed at employees other than plaintiff is relevant to show a hostile work environment." However, the court also cited *Jones v. Flagship International,* 793 F.2d 714, 721 n. 7 (5th Cir.1986), for this proposition. The court summarized the holding in *Jones* as follows: "Incidents of sexual harassment reported by other females bear on plaintiff's claim only if there is evidence that such incidents affected plaintiff's psychological well-being." *Hall,* 842 F.2d at 1015.

The issue before the *Hall* court involved the testimony of a co-plaintiff about the work environment experienced by all plaintiffs. Because hostile work environment harassment presupposes either interference with the plaintiff's work performance or a hostile work environment for the plaintiff, work environment evidence must be connected to plaintiff's working conditions. *See Hall,* 842 F.2d at 1013, 1015.

Accordingly, I ruled that plaintiff's witnesses would be allowed to testify about their perception of the work environment at G.M. if there was a showing that 1) the "environment" the witness would testify about was the same work environment Perkins experienced; and 2) Perkins knew about the other witnesses' experiences while working at Fairfax.

After being advised of this ruling, Caranchini repeatedly told me that the testimony of the work environment witnesses would be "tied in to plaintiff" and that it would become clear that "their experience impacted directly on Perkins' environment." Relying on this representation, I allowed Caranchini to present the testimony of eight work environment witnesses. Most of them were never "tied in to plaintiff" either by their own testimony or by Perkins' testimony.

Because the law in this Circuit on this issue is unclear, it is inappropriate to sanction Perkins or Caranchini on the grounds that they failed to make an adequate factual or legal investigation into this issue before I established the conditions for receiving this testimony.

G.M. also moves for § 1927 sanctions against Caranchini for multiplying the proceedings so as to unreasonably and vexatiously increase costs by misrepresenting to the court that the work environment witnesses would be "tied in to plaintiff."

Caranchini does not respond to this allegation other than to reiterate her argument that general work environment witnesses could have been proper if I had followed *Hicks.* However, as shown by pages 12–14 of plaintiff's Second Supplemental Answers to Defendant's Second Interrogatories to Plaintiff (Exhibit A to G.M.'s October 17, 1988, Motion in Limine regarding evidence of sexual harassment involving persons other than plaintiff), Perkins did not learn about several of her witnesses' allegations of sexual harassment, i.e., Mari Patterson, Connie Owens, Mary Stumpf and Janet Lisko–Ray, until *after* she filed this case. Therefore, the experience of these witnesses could not possibly have affected plaintiff's perception of her work environment because she did not know of these experiences while working at Fairfax. Consequently, Caranchini could not have connected these witnesses to plaintiff as she represented she would. It is not unreasonable to expect that after discovery and trial preparation counsel would know the facts well enough so that a representation of this type would be accurate. Were it not for Caranchini's representation, I would not have allowed the witnesses to testify. As a result, she unreasonably multiplied the proceedings. Accordingly, Caranchini will be sanctioned pursuant to § 1927 and will be required to pay G.M. its reasonable expenses incurred in examining and listening to witnesses Patterson, Owens, Stumpf and Lisko–Ray.

Because Caranchini is being sanctioned only for her representation that she would tie the witnesses to plaintiff, when she knew she could not, Caranchini will *not* be required to pay G.M. its expenses for time spent investigating or deposing plaintiff's work environment witnesses. Also, Caranchini will not be required to pay G.M. for time spent preparing the Motion in Limine on the work environment witnesses. No sanctions will be imposed against Perkins.

## IX. Sanctions Will be Imposed Against Caranchini Under Rule 11 and Against Caranchini Under § 1927 for Filing the Recusal Motion

■ After a year and a half of discovery, a bench trial on Perkins' Title VII claims began on November 1, 1988, and continued until January 9, 1989. On January 11, 1989, I announced from the bench that Perkins had not persuaded me that her version of her affair with Spivey was credible and, therefore, defendant would prevail. I stated that written Findings of Fact and Conclusions of Law would be issued at a later date.

On April 3, 1989, nearly three months after the trial ended, but before my written findings were issued, Perkins filed a motion supported by Caranchini's affidavit asking me to recuse and declare a mistrial. The Motion to Recuse, pursuant to 28 U.S.C. §§ 144 and 455, had two principal grounds—one concerning my wife and one concerning the law clerk who worked with me on this case.

In her affidavit, Caranchini stated:

1. That since this Court's ruling in the above captioned matters on January 11, 1989, there have been numerous articles in the local newspapers regarding the prospective merger of Gage & Tucker, counsel for defendant, and the law firm of Lathrop, Koontz, in which this Court's wife, Ms. Karen Iverson is a partner.

2. Prior to those articles in the newspapers the undersigned had no knowledge of the potential merger of those two law firms.

3. That discussions by the undersigned since those articles appeared with both Gene Owens and Jack Yates, partners with Gage & Tucker, confirm that such discussions of merger are presently ongoing and have been ongoing since prior to the announcement in the newspaper (although the exact dates of the commencement of those discussions is unknown by the undersigned).

4. That Ms. Karen Iverson has as her specialty labor law for management and is known in the legal community as a specialist in defending civil rights and wrongful discharge claims against companies and therefore has an interest in the outcome of any case in this District which would have impact on the defense of civil rights claims and wrongful discharge claims.

5. That the proposed merger of the two law firms would create one law firm in which Ms. Iverson would be a partner, having a financial interest in fees and distributions of profits from clients of the new law firm, including the defendant herein, General Motors; and would also have an interest in maintaining as one of the new firm's clients, General Motors, a major client if not source of income to Gage & Tucker presently, and any law firm with which Gage & Tucker may merge.

6. Gage & Tucker has had General Motors as a client in the area of labor law for a substantial period of time and there is no indication that GM would not continue to have the new law firm represent it in this area, especially given the augmented labor staff that would be available to GM from Lathrop Koontz['s] own labor area, including Ms. Iverson.

7. That during the trial of this matter, Ms. Iverson was present in the courtroom on at least one occasion observing the proceedings, including during the examination of Mr. Thomas Spivey.

8. That during the trial of this matter, this court informed counsel for the parties in chambers, that Ms. Terry Mills [sic], this court's law clerk on the pending matters, had been offered and accepted employment with a law firm in Detroit, Michigan which did work for General Motors, and as a result thereof, there may be the appearance of impropriety; the court offered to remove Ms. Mills [sic] from the further handling of the case, which the parties and their counsel respectfully declined. This court did not offer to recuse itself, however.

9. That based upon the above, it is clear Ms. Iverson will have a financial as well as legal interest in the outcome of the case; and, based upon this Court's prior conduct in offering to remove his law

clerk who was somewhat similarly situated to the Court's present situation, plaintiff's counsel believes there is a sufficient basis in fact that this court has a personal bias and or prejudice in favor of General Motors and/or that the facts are such that pursuant to 28 U.S.C. Sec. 455 this court must disqualify himself from further disposition of this matter.

On April 10, 1989, I issued an Order Denying Plaintiff's Motion for Recusal reserving the right to supplement the reasons stated therein, which I did by order of May 3, 1989.

G.M. now moves for Rule 11 sanctions against both Caranchini and Perkins and for § 1927 sanctions against Caranchini.

Caranchini's proffered reasons for recusal smack of bad faith for at least three reasons. First, the motion was untimely. My wife has been a partner at Lathrop, Koontz practicing employment law since before this case was filed and Caranchini knew this fact since before the case was filed. Therefore, her allegations of my bias due to my wife's "general interest" in employment litigation were untimely. However, assuming it was the rumor of merger that triggered Caranchini's concern, the motion was still untimely. Her explanation for not filing the motion from January to April is that she took a vacation, consulted with other attorneys and did various other things. If she truly believed the situation was as grave as she represented it to be, she would not have delayed so long.

Regarding my law clerk's employment, the following conference took place in chambers on November 21, 1988, in the presence of both Perkins and G.M.'s corporate representative:

The Court: Within the last half hour, my law clerk, Terry Milne, accepted employment next year with a law firm of Dickinson, Wright, Moon, Van Dusen and Freeman in Detroit, Michigan.... Terry also tells me that they do occasional legal work for General Motors. They are representing General Motors in two matters right now, but that General Motors is not considered a significant client, not in their top 50 clients.

Now, Ms. Milne has been on this case for—since she came to work with me and has a significant background developed throughout it. If anybody is concerned in the slightest about the fact that she has accepted a job with a firm that is presently representing General Motors in two matters, I will certainly be glad to listen and we will consider having Mr. Schram [sic], my other law clerk, take over as the law clerk assigned to this case.

Ms. Caranchini: None whatsoever, Your Honor.

Mr. Kelly: We have none, Your Honor. The Court: All right.... I wanted to raise it and give you all a chance to comment about it because it is something—it would have an affect obviously on the efficiency of which I operate in this case, but that is a small price to pay for—if anybody is concerned about the appearance of the matter, we will make the change immediately....

Ms. Caranchini: None, sir, whatsoever. The Court: Ms. Perkins, did you have any concern about that?

Ms. Perkins: No, sir, I don't.

Plaintiff's delay until April 3, 1989, in moving for recusal suggests other motivation than genuine concern about Ms. Milne's prospective employment.

The second indication of bad faith in the motion is that it lacks any merit whatsoever. Caranchini's argument that I should disqualify myself simply because my wife happens to work in the employment law field was unsupported by any authority or even sensible argument. Caranchini's conclusion that a law firm merger is a reality, supported only by an affidavit that says discussions are taking place, is faulty. Similarly, Caranchini's suggestion that I recuse because my law clerk accepted a position with a large firm in Detroit that occasionally represents G.M.—after Caranchini and Perkins both unequivocally stated they had no concerns about allowing that clerk to continue to work on the case—suggests other motivation than genuine con-

cern. Not surprisingly, the motion contained no legal authority even *suggesting* that recusal was appropriate in this situation.

The final indication of bad faith on the part of Perkins and Caranchini arises from facts that were set forth in the April 10, 1989, order denying the recusal motion. For example, on April 3, 1989, the date of the recusal motion, Perkins had pending in another division of this court a case against Thomas Spivey that was going to trial sometime during the three-week period beginning April 17, 1989. As a result of a telephone call from Caranchini to my office, she knew that I planned to issue the findings and conclusions in this case in early April. Caranchini knew that if my findings were issued before the Spivey trial began, the chance that my decision in this case would have some preclusive effect on that case would be increased. As I stated in the April 10, 1989, order, "a reasonable person in possession of all the facts would conclude that this [recusal] motion was a last ditch, desperate attempt to delay the issuance of findings and conclusions in this case until after plaintiff's case against Thomas Spivey can be tried in another division of this court." *Id.* at 4.

For all these reasons, I am convinced that the recusal motion was filed without a reasonable or even arguable basis in fact or law. Thus, both Perkins and Caranchini will be sanctioned under Rule 11. Caranchini will also be sanctioned for the same conduct under § 1927. Accordingly, Caranchini will be required to pay G.M.'s reasonable expenses including attorney's fees incurred in responding to plaintiff's Motion for Recusal.

### X. *Conclusion*

Therefore, it is hereby ORDERED that:

1) sanctions will be imposed against Perkins and Caranchini as stated in this order;

2) within 30 days from the date of this order, G.M. shall file and serve upon Caranchini and Perkins a detailed claim for its reasonable expenses consistent with this order. This claim should include a description of the work done, the time spent and the reasonable hourly rate or value of the services rendered;

3) within 20 days after G.M. files its claim, Caranchini and/or Perkins may file a statement commenting upon: a) the reasonableness of claims by G.M.; and b) whether and to what extent imposition of the requested sanctions would create an unreasonable financial hardship on them or their dependents. Caranchini and Perkins should specifically identify any disagreement about the reasonableness of what G.M. claims was done for it or about the reasonableness of the monetary value of those services claimed by G.M.;

4) within 15 days after Caranchini and Perkins file the response required in paragraph 3), G.M. may file a reply; and

5) any party to these proceedings, including Caranchini, may in their submissions comment on the appropriateness of the allocation of responsibility as between Perkins and Caranchini.