**PROJECT 74 ALLENTOWN, INC.**

v.

**Beverly FROST, et al.**

**Civ. A. No. 91–5464.**

United States District Court,
E.D. Pennsylvania.

Aug. 10, 1992.

Joseph M. Aronow and Michael Manarel, Frank & Aronow, New York City, for plaintiff.

James Schwartzman, Schwartzman and Hepps, Philadelphia, Pa., for Beverly Frost and Robert Reichard.

A. Richard Feldman, Bazelon and Less, Philadelphia, Pa., for Lynda Moyer.

Robert McFadden, Allentown, Pa., for Barry Isett & Associates.

Christina Nealy, pro se.

## OPINION

CAHN, District Judge.

Project 74 Allentown, Inc. ["Project 74"] is a corporation formed by, *inter alia*, Eliyahou Aryeh, Moussa Aryeh, Ouriel Aryeh and Abraham Arab, in order to develop a 74 acre parcel of land on Spring Creek Road in Lower Macungie Township, Lehigh County, Pennsylvania. The property was originally owned by defendants Frost and Reichard. Defendant Moyer introduced the incorporators of the plaintiff to the property. Moyer was, during this transaction, employed by defendant Century 21 Daystar, Inc., a realty brokerage owned by defendant Nealy. The plaintiff intended to subdivide, and then resell, this property. In order to facilitate subdivision approval, the plaintiff hired defendant Isett to complete the engineering work required for the project.

To facilitate the sale, which was consummated in May of 1988, defendants Frost and Reichard "took back" a purchase money mortgage. This "balloon" mortgage exceeded one million dollars, and was payable in three years. Shortly before the balloon payment became due, the plaintiff filed the instant suit, alleging that the defendants had entered into a RICO conspiracy to defraud the plaintiff. The trial of this case before a jury commenced on May 21, 1992. Following the conclusion of the plaintiff's case on the fifth day of the trial, the court entered judgment as a matter of law in favor of the defendants.[1] The defendants have now moved for sanctions pursuant to Fed.R.Civ.P. 11.[2] The court held a hearing on the Rule 11 Motions on August 3, 1992.[3] For the following reasons, the court will now grant the defendants' Motions.

## I. *Standards for the Imposition of Rule 11 Sanctions*

Rule 11 provides, in the relevant part, that

Every pleading, motion, and other paper ... shall be signed.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11.

"It is now clear that the central purpose of Rule 11 is to deter baseless filings in

---

**1.** The court initially delivered the Opinion granting the defendants' Rule 50(a) Motions from the bench. In its bench Opinion, the court reserved the right to edit the Opinion, and to add footnotes containing citations to legal authorities. The edited Opinion is available on Westlaw. *See Project 74 Allentown, Inc. v. Frost,* 1992 Westlaw 151319 (E.D.Pa. June 22, 1992).

**2.** The defendants have filed four separate Motions for Rule 11 sanctions. The first was filed by counsel for defendants Frost and Reichard on June 29, 1992. The next two Rule 11 Motions were both filed on July 22, by counsel for defendants Isett and Moyer. Finally, Christina Nealy, appearing *pro se,* filed a Rule 11 Motion on July 23, 1992. All of the Motions seek sanctions against Joseph Aronow, Esq., Michael Manarel, Esq., Project 74 Allentown, Inc., Eliyahou Aryeh, Moussa Aryeh, Ouriel Aryeh and Abraham Arab. Since there are no material differences between the Motions, the court will proceed as if all of the Motions were identical, and were filed on June 29, 1992.

**3.** Since the court is aware, and appreciative, of the need for due process before imposing sanctions on lawyers or litigants, *see, e.g.,* Stephen B. Burbank, *Rule 11 in Transition: The Report of the Third Circuit Task Force on Federal Rule of Civil Procedure 11* 30 (1989), the court's Order of July 20, 1992 specified that the defendants' Motions for Rule 11 sanctions would be the topic of the August 3rd hearing, and ordered the parties against whom the defendants sought the imposition of sanctions to attend the hearing personally. The court further directed the attorneys for defendants Frost and Reichard to serve copies of the court's July 20th Order, along with copies of the pleadings seeking (and opposing) the imposition of Rule 11 sanctions, on Eliyahou Aryeh, Moussa Aryeh, Ouriel Aryeh and Abraham Arab personally. Since Joseph Aronow and Michael Manarel are the attorneys of record for Project 74, they have been served by the clerk of the court.

Joseph Aronow, Michael Manarel, Moussa Aryeh, Ouriel Aryeh and Abraham Arab attended the hearing, and were given an opportunity to be heard. The court therefore finds that Due Process does not present a barrier to the imposition of sanctions on them. Although numerous attempts were made to serve Eliyahou Aryeh, the efforts to effect service upon him were unsuccessful. Eliyahou Aryeh was not present at the hearing. Since Eliyahou Aryeh will not be sanctioned, *see infra* Section V.A.4., the court does not address the question of whether due process would prevent the imposition of sanctions on him.

District Court and thus, consistent with the Rule Enabling Act's grant of authority, streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359, 374 (1990). *See also Business Guides Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, ——, 111 S.Ct. 922, 928–29, 112 L.Ed.2d 1140, 1153 (1991). "[T]he 1983 revision of Rule 11 was designed to prevent abuse caused not only by bad faith but by negligence and, to some extent, by professional incompetence." *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir. 1987).

Although Rule 11 has not been consistently applied throughout the Nation, *see* Stephen B. Burbank, *Rule 11 in Transition: The Report of the Third Circuit Task Force on Federal Rule of Civil Procedure 11* xiv, 56 (1989),[4] certain aspects of Rule 11 jurisprudence are clear. First, "[t]he Rule imposes an obligation on counsel and client analogous to the railroad crossing sign, 'Stop, Look and Listen.' It may be rephrased, 'Stop, Think, Investigate and Research' before filing papers either to initiate a suit or to conduct the litigation." *Gaiardo*, 835 F.2d at 482. *See also Cooter & Gell*, 496 U.S. at 385, 110 S.Ct. at 2450, 110 L.Ed.2d at 377, *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 94 (3d Cir.1988); *Matthews v. Freedman*, 128 F.R.D. 194, 197 (E.D.Pa.1989), *aff'd*, 919 F.2d 135 (3d Cir.1990) ("The purpose of the rule is simple: to discourage pleadings that are frivo-

lous, legally unreasonable, or without factual foundation."); *Syntex Pharmaceuticals International, Ltd. v. K–Line Pharmaceuticals, Ltd.*, 1988 Westlaw 106314 at *2, (D.N.J. October 14, 1988); Burbank, *supra*, at 3.[5]

■ Second, Rule 11 can only be violated if the signing of the document in question was unreasonable under the circumstances. *See Business Guides*, 498 U.S. at ——, 111 S.Ct. at 932–33, 112 L.Ed.2d at 1159; *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 289 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Teamsters Local Union No. 430 v. Cement Express, Inc.*, 841 F.2d 66, 68 (3d Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988); *Gaiardo*, 835 F.2d at 482; *Matthews*, 128 F.R.D. at 197. Although a court must avoid the use of hindsight to determine whether signing a document was reasonable under the circumstances, *see Schering Corp. v. Vitarine Pharmaceuticals, Inc.*, 889 F.2d 490, 496 (3d Cir.1989); *Lingle*, 847 F.3d at 94; *Matthews*, 128 F.R.D. at 197; Fed.R.Civ.P. 11 Advisory Committee Notes ("The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted."), it is the objective reasonableness of the signing which must be evaluated, *see Ford Motor Co.*, 930 F.2d at 289; *Lingle*, 847 F.2d at 94, not the subjective intent or belief of the signer.

---

4. It is for this reason that the court has relied on the decisions of the Third Circuit Court of Appeals in evaluating the defendants' Motions, rather than the decisions of other Courts of Appeals (such as the Court of Appeals for the Seventh Circuit) which have endorsed a more liberal application of Rule 11. *Compare* Burbank, *supra*, at 45 ("the Third Circuit is regarded as a 'low sanction' circuit") *with* Burbank, *supra*, at 59 ("We suspect that, as an example, the icebergs [of Rule 11 cases] are larger in the Seventh Circuit").

5. Although Rule 11 should not be used to "chill" zealous advocacy, *see Smith v. BIC Corp.*, 869 F.2d 194, 202 (3d Cir.1989); *Napier v. Thirty or More Unidentified Federal Agents*, 855 F.2d 1080, 1091 (3d Cir.1988); *Greiss v. Main Line Auto Wash*, 1989 Westlaw 89227 at *1 (E.D.Pa. Au-

gust 1, 1989); Fed.R.Civ.P. 11 Advisory Committee Notes ("The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories."), "there will be cases when adventuresome legal theories are irresponsible and frivolous; otherwise Rule 11 would be rendered meaningless." *Matthews*, 128 F.R.D. at 199. *See also Gaiardo*, 835 F.2d at 484 ("Counsel or client violates the Rule by mounting an attack on existing law not in good faith but rather prompted by such improper considerations as harassment or undue delay. Creativity by itself is not enough. The creativity must be in service of a good faith application of the law or at least a good faith request for a change in the law.' However, distortion of a statute is 'precisely the sort of creativity Rule 11 should chill.' ") (citation omitted).

*See Napier,* 855 F.2d at 1091. In short, "a pure heart and an empty head" is not a defense to a Rule 11 violation. *See Gaiardo,* 835 F.2d at 482.[6] Finally, if a court finds that Rule 11 has been violated, the imposition of sanctions is mandatory. *See Cooter & Gell,* 496 U.S. at 393, 110 S.Ct. at 2454, 110 L.Ed.2d at 374; *Perkins v. General Motors Corp.,* 129 F.R.D. 655, 658 (W.D.Mo.1990); *Matthews,* 128 F.R.D. at 206 n. 3.

## II. *Parties Against Whom Sanctions Can Be Imposed*

### A. Under Rule 11

Rule 11 can only be violated by a person who has signed a pleading, motion, or other paper which has been filed with the court.[7] *See Landon v. Hunt,* 938 F.2d 450, 453 (3d Cir.1991); *Schering,* 889 F.2d at 496; *Cement Express,* 841 F.2d at 69; *Curley v. Brignoli Curley & Roberts Associates,* 128 F.R.D. 613, 616 (S.D.N.Y. 1989).[8] Once a pleading, motion, or other paper has been signed, the court has the discretion to impose sanctions upon the attorney or the party whose signature appears. *See* Fed.R.Civ.P. 11 Advisory Committee Notes ("If the duty imposed by the rule is violated, the court should have the discretion to impose sanctions on either the attorney, the party the signing attorney represents, or both"). Sanctions can only be imposed, however, upon the actual signatory. *See Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 122–24, 110 S.Ct. 456, 457–59, 107 L.Ed.2d 438, 443 (1989).

Even if the signer's signature was not required to appear, the appearance of the signature brings the signer within the purview of Rule 11, and exposes her to sanctions if the Rule is violated. *See Business Guides,* —— U.S. at ——, 111 S.Ct. at 932–33, 112 L.Ed.2d at 1159. Additionally, a party cannot claim to have relied upon another person's representation that an adequate investigation has been performed; the duty imposed by Rule 11 is personal and non-delegable. *See Pavelic,* 493 U.S. at 124–25, 110 S.Ct. at 458–59, 107 L.Ed.2d at 444.

The standard for sanctioning a private party under Rule 11 is the same as the standard for sanctioning an attorney. *See Business Guides,* —— U.S. at ——, 111 S.Ct. at 929, 112 L.Ed.2d at 1157–58; Fed. R.Civ.P. 11 Advisory Committee Notes ("the standard is the same for unrepresented parties."); *Navarro–Ayala v. Nunez,* 968 F.2d 1421, 1425 (1st Cir.1992). Attorneys and litigants cannot be sanctioned, however, simply because they have not prevailed. *See Cement Express,* 841 F.2d at 68; *Greiss,* 1989 Westlaw 89227 at *1. Rule 11 sanctions may only be imposed in

---

6. Although a "pure heart" is not a defense to a Rule 11 violation, a court may, at its discretion, consider the willfulness (or the lack thereof) of a Rule 11 violation as a mitigating factor when determining the appropriate sanction to redress a violation of Rule 11. *See Doering v. Union County Board of Chosen Freeholders,* 857 F.2d 191, 197 n. 6 (3d Cir.1988).

7. Since a corporation can act only through its agents, officers or employees, Rule 11 sanctions can be imposed on a corporation if a natural person, signing on the corporation's behalf, failed to make the appropriate pre-filing investigation. *See Business Guides,* —— U.S. at ——, 111 S.Ct. at 931–32, 112 L.Ed.2d at 1157. The fact that the duties imposed by Rule 11 are personal and non-delegable, however, permits a court to sanction the individual who signed a paper on behalf of a corporation, as well as the corporation itself. *See Navarro–Avala v. Nunez,* 968 F.2d 1421, 1427 (1st Cir.1992) ("when a public official or corporate officer violated Rule

11 in the course of performing agentival duties, it is permissible—and frequently wise—from the standpoint of deterrence to direct that the offender pay a monetary sanction personally."); *Ultracashmere House Ltd. v. Nordstrom, Inc.,* 123 F.R.D. 435, 437 (S.D.N.Y.1988) (imposing sanctions on both a corporation and on the corporation's president); *cf. Pavelic & LeFlore v. Marvel Group,* 493 U.S. 120, 122–24, 110 S.Ct. 456, 457–59, 107 L.Ed.2d 438, 443 (1989).

8. Answers to discovery requests, (i.e. answers to interrogatories) are not governed by Rule 11; they are governed by Fed.R.Civ.P. 26(g). *See Brubaker v. City of Richmond,* 943 F.2d 1363, 1383 n. 26 (4th Cir.1991); *Perkins,* 129 F.R.D. at 658–59; *Curley,* 128 F.R.D. at 616; *Syntex,* 1988 Westlaw 106314 at *2–*3; Fed.R.Civ.P. 11 Advisory Committee Notes ("Although the encompassing reference to 'other papers' in new Rule 11 literally includes discovery papers, the certification requirement in that context is governed by proposed new Rule 26(g).").

exceptional circumstances. *See Ford Motor Co.*, 930 F.2d at 289; *Muller v. Temura Shipping Co.*, 1989 Westlaw 83592 at *1 (E.D.Pa. July 24, 1989).

### B.  Under Rule 26(g) [9]

■ Rule 26(g) provides, in the pertinent part, that

The signature of the attorney or party [on a discovery response] constitutes a certification that the signer has read the request, response, or objection, and that to the best of the signer's knowledge, information, and belief formed after a reasonable inquiry it is: (1) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.... If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

Fed.R.Civ.P. 26(g).

This Rule allows the court to impose sanctions on the signer of a discovery response when the signing of the response was objectively unreasonable under the circumstances. *See Apex Oil Co. v. Belcher*

Co. of New York, 855 F.2d 1009, 1017 (2d Cir.1988); *Perkins*, 129 F.R.D. at 659; *Syntex*, 1988 Westlaw 106314 at *3; Fed. R.Civ.P. 26(g) Advisory Committee Notes (Rule 26(g) "obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection.").

■ Answers to interrogatories are unquestionably "responses" within the meaning of Rule 26(g). *See Bergeson v. Dilworth*, 749 F.Supp. 1555, 1565 (D.Kan. 1990). Rule 26(g) can only be invoked, however, if the signing of a *specific* discovery response (or objection, or request) was objectively unreasonable under the circumstances; the general tenor of a response cannot form the basis for sanctions under Rule 26(g). *See Apex Oil*, 855 F.2d at 1017.

■ The standards for granting a Motion for Rule 26(g) sanctions are the same as the standards for granting a Motion for sanctions pursuant to Rule 11. *See Apex Oil*, 855 F.2d at 1015; *Bergeson*, 749 F.Supp. at 1565–66; *Perkins*, 129 F.R.D. at 659; *Syntex*, 1988 Westlaw 106314 at *2; Fed.R.Civ.P. 26(g) Advisory Committee Notes (Rule 26(g) imposes "an objective standard similar to the one imposed by Rule 11.").[10] As with Rule 11, the court must eschew the use of hindsight, and impose sanctions under Rule 26(g) only if signing the document was unreasonable under the circumstances. *See Bergeson*, 749 F.Supp. at 1566. If a court finds that Rule 26(g) has been violated, the court may use its discretion to impose an appropriate sanction, *see Hayes v. National Gypsum Co.*, 38 Fed.R.Serv.2d 645, 646 (E.D.Pa. 1984). Some sanction, however, must be imposed if the Rule has been violated. *See Bergeson*, 749 F.Supp. at 1566. Finally, as with Rule 11, the inability of a party to

---

**9.** Even though the parties did not seek sanctions pursuant to Fed.R.Civ.P. 26(g) in their Motions, the court has the authority to make a *sua sponte* determination as to whether Rule 26(g) sanctions should be imposed. *See Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 1009, 1014 (2d Cir.1988); Fed.R.Civ.P. 26(g) ("If a certification is made in violation of the rule, the court,

upon motion *or upon its own initiative,....*") (emphasis supplied).

**10.** Indeed, some courts have held that it is "easier" to impose sanctions pursuant to Rule 26(g) than it is to impose sanctions pursuant to Rule 11 because the Rule 26(g) certification requirement is more stringent. *See Apex Oil*, 855 F.2d at 1015.

produce any evidence at trial to support a proposition set forth in a discovery response is probative of the fact that Rule 26(g) has been violated. *See Perkins*, 129 F.R.D. at 662.

### III. The Timeliness of the Defendants' Motions for Sanctions

In *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), the Supreme Court invited the various Judicial Circuits to establish supervisory rules to regulate the time within which a Rule 11 Motion must be filed. *See Cooter & Gell*, 496 U.S. at 391–92, 110 S.Ct. at 2454, 110 L.Ed.2d at 377. The Court of Appeals for the Third Circuit did so in the case of *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90 (3d Cir.1988), when it held that a Rule 11 motion must be filed as soon as possible after the discovery of the alleged Rule 11 violation, and in no event later than the entry of final judgment. *See Lingle*, 847 F.2d at 100. *See*

*also Muller*, 1989 Westlaw 83592 at *1. Since the final judgment in this case was entered on June 1, 1992, and since the defendants' first Rule 11 Motion was not filed until June 29, 1992,[11] the Motions would appear, at first glance, to be barred by the *Lingle* rule. Upon closer examination, however, it appears that there are two reasons that the defendants' Motions are not barred.

First, it appears that the goal the Third Circuit Court of Appeals had when it formulated the *Lingle* rule was to prevent multiple or piecemeal appeals. *See Lingle*, 847 F.2d at 98. Because the final judgment in this case was entered on June 1, 1992, the time for filing an appeal ran thirty days later, on July 1, 1992. *See* Fed.R.App.P. 4(a)(1).[12] Since the plaintiff has not filed a Notice of Appeal, and since there is no "good cause" within the meaning of Fed.R.App.P. 4(a)(5) for the plaintiff's failure to file a Notice of Appeal,[13]

---

**11.** Since the court has the power to impose Rule 11 sanctions *sua sponte, see* Burbank, *supra,* at 57, the fact that not all of the defendants' Rule 11 Motions were filed on the same day is irrelevant. Once counsel for defendants Frost and Reichard moved for the entry of Rule 11 sanctions, the court would have proceeded to evaluate the plaintiff's conduct vis a vis all of the defendants, even if the other defendants had not filed their own Rule 11 Motions. It is for this reason that the court is treating all of the defendants' Rule 11 Motions as if they were filed on June 29, 1992.

**12.** The Supreme Court has established "a uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent a judgment on the merits from being final." *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 202, 108 S.Ct. 1717, 1721–22, 100 L.Ed.2d 178 (1988). This rule "does not turn upon the characterization of those fees by the statute or decisional law that authorizes them." *Budinich,* 486 U.S. at 201, 108 S.Ct. at 1721. Under *Budinich,* a trial court's judgment is final, and therefore appealable, even though a motion for attorney's fees is still pending. Because a Rule 11 motion often seeks an award of attorney's fees, courts have held that the filing of a Rule 11 Motion does not toll the running of the 30 day time period for the filing of an appeal. *See Bogney v. A.W. Jones,* 904 F.2d 272, 273 n. 1 (5th Cir.1990); *Cleveland v. Berkson,* 878 F.2d 1034, 1036 (7th Cir.1989) ("To avoid any further ambiguity with respect to this issue, we now hold that the pendency of such [Rule 11] motions in

the district court, when the district court definitively and completely has disposed of the entire case on the merits, does not render the district court's judgment nonfinal."). *See also Cooter & Gell,* 496 U.S. at 394, 110 S.Ct. at 2455, 110 L.Ed.2d at 375–76 (a Rule 11 Motion is a collateral issue and may be considered by a district court even though an appeal of the decision on the merits has been filed); *Schering,* 889 F.2d at 495 (same); *Lingle,* 847 F.2d at 97–98 (same); *Crossman v. Maccoccio,* 792 F.2d 1, 3–4 (1st Cir.1986); *American Manufacturers Mutual Ins. Co. v. Edward D. Stone, Jr. & Assoc.,* 743 F.2d 1519, 1522 (11th Cir.1984) (only specified motions extend the thirty day time limit set forth in Fed.R.App.P. 4(a); the presence of ancillary post trial issues does not toll the running of the time for the filing of an appeal); *Obin v. District No. 9 of the International Association of Machinists,* 651 F.2d 574, 584 (8th Cir.1981) ("When a final judgment on the merits has been entered in an action in which a claim for attorney's fees remains pending, the time for appeal on the merits runs from the entry of judgment. Subsequent consideration by the district court of the attorney's fees claim does not toll the time for appealing the judgment on the merits.").

**13.** Since the first footnote of the court's revised Opinion expressly provided that "For purposes of Fed.R.Civ.P. 59, 60 and Fed.R.App.P. 4, parties should treat this Opinion as having been entered on May 29, 1992," *see Project 74,* 1992 Westlaw 151319 at *3, the plaintiff cannot claim to have been unaware of the time period proscribed for the filing of an appeal.

there can be but one appeal in this case, an appeal from the Order granting Rule 11 sanctions. Given that there can be only one appeal in this case, and in light of the fact that the Third Circuit Court of Appeals appears to have recognized at least one exception to the *Lingle* rule, *see Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 505 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991) (approving an award of attorneys fees under the district court's power to award Rule 11 sanctions; the motion for attorney's fees was filed at the conclusion of a bench trial), the court is of the opinion that the defendants' Motions are not barred by the *Lingle* rule.[14] *Cf. Matthews,* 128 F.R.D. at 205–06 (distinguishing the *Lingle* rule); Burbank, *supra,* at 83 (appeals of Rule 11 sanctions do not impose a burden on the appellate courts).

Second, the filing of a Rule 11 Motion prior to the court's entry of final judgment would have been futile. In light of the "unsettled" state of RICO caselaw, the court afforded the plaintiff every opportunity to present facts which would support its case. When the defendants moved for the entry of summary judgment on the eve of trial, the court decided that, on balance, it was preferable to allow the plaintiff to proceed to trial.[15]

The court's decision was based primarily on the fact that the plaintiff's case was fairly well grounded in the law. The plaintiff alleged, in essence, that real estate agents (defendants Nealy and Moyer) conspired with engineers (defendant Isett) to sell property at inflated prices. The plaintiff further alleged that the property owners (defendants Frost and Reichard) were members of this conspiracy, and that the defendants made numerous misrepresentations (over the phone lines) in furtherance of this conspiracy.

On their face, such allegations (that real estate agents and engineers conspired with landowners to defraud unsuspecting buyers) are sufficient to state a RICO claim. For this reason, the plaintiff's complaint was not susceptible to attack at the pretrial stage. The problem arose when the plaintiff was unable to produce *any* evidence at trial in support of its allegations.[16] While the court is aware of the "long arm" of RICO, its reach is not infinite. Although it should be obvious, the court feels obliged to state that not every business deal which involves the use of a telephone, and which later turns sour, can form the basis for a RICO claim. *Cf.* Burbank, *supra,* at 60. Because the plaintiff's failure to produce any evidence at trial in support of its allegations has highlighted the lack of pre-filing investigation by the plaintiff, and since a full record of the facts underlying this claim has now been developed, the court will now turn to the merits of the defendants' Rule 11 Motions.[17] *Cf. Lingle,*

---

**14.** The court notes that many of the courts applying the *Lingle* rule did so in cases where the Rule 11 motion in question was filed long after the conduct complained of and the entry of final judgment. *See Landon,* 938 F.2d at 453 (Rule 11 motion filed almost six months after the entry of final judgment); *Lingle,* 847 F.2d at 93 (Rule 11 Motion filed seven months after the entry of final judgment); *Muller,* 1989 Westlaw 83592 at *2 n. 3 (Rule 11 motion filed two years after the occurrence of the conduct complained of, and six months after the entry of final judgment). This is not a case in which the defendants waited an inordinately lengthy period of time before filing their Rule 11 Motions.

**15.** While the entry of summary judgment on the eve of trial would have saved some of the time, money and effort put into this case, the parties had already expended substantial resources completing discovery and trial preparation. Given the contentious nature of this proceeding (and the related state court foreclosure proceed-

ings), the plaintiff would have almost certainly appealed the entry of summary judgment against it. An appeal would have resulted in more delay and expense. By allowing the case to go to trial, the court allowed the plaintiff the fullest opportunity to develop a record.

**16.** *Cf. Business Guides,* 498 U.S. at —, 111 S.Ct. at 926, 112 L.Ed.2d at 1151 (Rule 11 sanctions imposed when the plaintiff could not produce any evidence to support its copyright infringement claim); *Pavelic,* 493 U.S. at 123, 110 S.Ct. at 458, 107 L.Ed.2d at 442 (Rule 11 sanctions imposed when the plaintiff could not produce any evidence to support its forgery claim).

**17.** The court is aware that *Lingle* and its progeny require a Rule 11 Motion to be filed "promptly." *See Lingle,* 847 F.2d at 99. Given the need for the defendants to conduct a pre-filing investigation before filing their Motions, the court is unwilling to hold that a Rule 11 Motion filed 29 days after the time the (alleged) violation of

847 F.2d at 99 ("the sanctions issue under Rule 11 normally will be determined at the end of the litigation.") (citation omitted), Burbank, *supra,* at xxii.

## IV. *Amount of Sanctions*

▬▬▬ A Rule 11 sanction should be tailored to effect deterrence; the sanctioned party should be deterred from making such a filing in the future, and other parties should be deterred from making similar filings in other cases. *See Cooter & Gell,* 496 U.S. at 393, 110 S.Ct. at 2454, 110 L.Ed.2d at 374; *Napier,* 855 F.2d at 1091 (while a court use Rule 11 as a cost shifting measure, "Rule 11 does not require an award of actual fees."); *Doering v. Union County Board of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir.1988) (listing alternative sanctions); *Matthews,* 128 F.R.D. at 202 ("Rule 11 does not limit the court's choices [of sanctions]."); Burbank, *supra,* at 11. Courts must be careful, however, to avoid using Rule 11 to "overdeter" lawyers or litigants. *See Doering,* 857 F.2d at 196; *Matthews,* 128 F.R.D. at 203 ("the least severe sanctions adequate to serve [this] purpose should be imposed.") (citation omitted). Specifically, the court must take the signer's ability to pay into consideration when formulating a Rule 11 award. *See Doering,* 857 F.2d at 195; *Matthews,* 128 F.R.D. at 203.[18]

## V. *Persons Against Whom Sanctions Will Be Imposed*

The Third Circuit Court of Appeals has established a five pronged test under which district courts can evaluate the reasonableness of the pre-filing inquiry conducted by the signer of a document. The district court must consider (1) the amount of time

available for pre-filing investigation; (2) the need to rely on a client to provide factual information; (3) whether the case was referred to the signer by another member of the bar; (4) the plausibility of the legal position advocated by the pleading; and (5) the complexity of the legal and factual issues raised by the pleading. *See Lingle,* 847 F.2d at .95; *Matthews,* 128 F.R.D. at 197. In the interest of simplicity and brevity, the court has chosen to discuss a single document in violation of Rule 11 or Rule 26(g) for each person being sanctioned. This is not to imply that the sanctioned party did not sign other documents which also violated Rule 11 or Rule 26(g), or that the documents described by the court could not have been held to violate Rule 11 or Rule 26(g) in other ways.

### A. Under Rule 11

#### 1. Joseph Aronow

▬▬ Paragraph fifty-seven of the plaintiff's complaint alleges that

In violation of 18 U.S.C. section 1962(c), Defendants Frost, Reichard, Century 21, Nealy, Moyer and Isett, all persons within the meaning of RICO, formed an association in fact for the purpose of defrauding Plaintiffs, and said association is an enterprise within the meaning of 18 U.S.C. section 1961(4) which engaged in, or the activities of which affect, interstate or foreign commerce. That commencing on or about March, 1987, Defendants agreed and conspired to defraud Plaintiff with a series of schemes which induced Plaintiff into purchasing real property and entering into a mortgage, through a pattern of fraudulent misrepresentations. That these misrepresenta-

---

Rule 11 became apparent is not filed "promptly."

**18.** Although the court has examined the expenses incurred by the defendants in trying this case, the court has not chosen to award the defendants counsel fees. Instead, the court will impose an "appropriate sanction" which will deter these parties, and others in similar situations, from engaging in similar activities in the future. The court has, however, examined the list of expenses incurred by the defendants, the total of which is nearly $400,000, because the

court believes that the level of expense to which the defendants were put is helpful in determining the amount of an "appropriate" sanction. Since the court is not imposing an award of counsel fees, the court will not analyze the reasonableness of the counsel fees in detail. The court will simply note that, while it does not agree with every charge incurred by defense counsel in this case, it finds that the hours billed, and the rates charges, are, on the whole, reasonable.

tions detailed above encouraged Plaintiff to first enter into a contract of sale, then pursuant to the contract, induced Plaintiff to enter into a mortgage agreement, and induced Plaintiff to contract with Defendant Isett for engineering services at exorbitant and inflated rates.

Complaint at ¶ 57. The complaint further alleges that "[i]n the course of inducing Plaintiff to enter into this contract for sale, and mortgage agreement, Defendants made certain fraudulent material misrepresentations to Plaintiff." Complaint at ¶ 62. The complaint was signed by Joseph Aronow on April 25, 1991.

At trial, the plaintiff was unable to present any evidence of the existence of an enterprise. *See Project 74*, 1992 Westlaw 151319 at *1. A review of the trial transcript reveals that neither of the plaintiff's witnesses [19] testified to any facts from which the jury (or the court) could infer that the defendants conspired in any way. Finally, far from testifying as to the misrepresentations which formed the basis of this alleged conspiracy, the plaintiff's witnesses actually testified that they had no knowledge of any misrepresentations. *See, e.g.,* (testimony of Eliyahou Aryeh) N.T. May 22, 1992 at 126–34; N.T. May 22, 1992 at 143–44 ("Q: Do you know, sir, of any facts which tend to show that when Lynda Moyer made the various statements to you that you've described that she made them with knowledge that they were false or untrue? A: No, I don't know that she said lies.... Q: Do you know of any facts to suggest that when Chris Nealy made the statements to you that you've described that she believed them to be—or had knowledge that they were false or untrue? A: No. Q: Sir, do you have any facts at your disposal which show that when Mr. Isett made any of the statements to you that you've described in your testimony that he know or believed them to be false or untrue? A: I have my doubts."); N.T. May 22, 1992 at 148–49 ("Q: Now, sir, sitting here today, isn't it true that you have no information that the defendants in this case deliberately and knowingly worked together in fact with each other to deceive or defraud or cheat you and your relatives in connection with the Spring Creek Road property; isn't that true? A: I have no information that they were together knowingly to defraud me."); N.T. May 27, 1992 at 6 ("Q: What did Mrs. Frost say to you about this land and, of those statements that she said to you, which one of them are lies? A: There was not direct statements made, your Honor. Q: Thank you, sir. Now, with regard to Robert Reichard, could you tell me, sir, what statements he made to you with regard to the 74 acres that contained misrepresentations or lies? A: There was no direct statements to me."); N.T. May 27, 1992 at 19–20 ("Q: you're aware, sir, that to this date Christina Nealy has never been on that 74–acre parcel of property, are you not, sir? A: That's possible, sir, that's possible."); N.T. May 27, 1992 at 35 ("Q: Could you give this jury any evidence that you have today of any conspiracy, association or anything whatsoever between my clients, Beverly Frost and Dr. Robert Reichard, who are two of the defendants in this case, showing that they conspired with Defendant Barry Isett at any time? A: If you're talking about statements with the mouth, no, sir."); N.T. May 27, 1992 at 38 ("Q: Do you know of any evidence as you sit here to day about these defendants being involved in the practice of defrauding parties similarly situated as plaintiff in the State of Pennsylvania? A: I don't know of any, sir."); (testimony of Moussa Aryeh) N.T. May 28, 1992 at 94 (in response to a question about representations allegedly made by defendant Moyer "A: She was trying to warm me up to, you know, to build you an appetite, you know, to buy more. There's no crime in that."); N.T. May 28, 1992 at 105–06 ("Q: So you don't have any basis in fact, sir, for suggesting that Lynda Moyer should have known about pumping stations or about easements back in May of 1987 when she made these statements to you; do you? A: I have no knowledge about that. Maybe she knew. Maybe she didn't know. I don't know."); N.T. May 28, 1992 at 108–09 ("Q: Well sir,

---

**19.** The plaintiff presented only two witnesses before resting.

when Lynda Moyer made these alleged—according to you made these various statements that there is water and sewer available, that you could make a lot of money, that it might take six months to a year, that there shouldn't be any problem with approvals, isn't it possible, sir, that she made those statements in complete good faith, without any intent to deceive you? A: I have no idea."); N.T. May 29, 1992 at 20 ("Q: What proof do you have that [defendant Nealy] was [on the Project 74 property]? A: I have no proof."); N.T. May 29, 1992 at 51 ("Q: Sitting here today, sir, can you tell us—tell the ladies and gentlemen of the jury and his Honor any statements that Beverly Frost made to you either prior to closing, at closing or subsequent to closing? These are statements that she made to you.? A: Well, she didn't make any statement directly to us."); N.T. May 29, 1992 at 65 ("Q: Do you have any reason to believe that Beverly or Bob knew Barry Isett prior to the filing of the lawsuit? A: I have no idea.").[20]

The court is at a loss to understand how an attorney could undertake an investigation, the results of which would result in an objectively reasonable[21] belief that the allegations contained in paragraphs fifty-seven and sixty-two of the complaint were being filed for a proper purpose, and be unable to present any evidence to support the truth of those allegations at trial. A review of the trial transcript leaves the court with the firm belief that the complaint, and specifically the allegations contained in paragraphs fifty-seven and sixty-two, was filed as a "preemptive strike" to delay the state court foreclosure action later filed by defendants Frost and Reichard,[22] and to harass or annoy the defendants.

Turning to the factors set forth in *Lingle*, the court finds that Mr. Aronow had adequate time in which to perform a pre-filing investigation. The statute of limitations for a RICO claim is four years. *See Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). Since the plaintiff's witnesses testified that they were unaware of the "facts" which gave rise to this complaint[23] until at least 1988, *see Project 74*, 1992 Westlaw 151319 at *2, the statute of limitations would not have run until 1992. Mr. Aronow could have spent at least six additional months investigating the factual basis for this complaint.

Furthermore, the factual basis for this complaint was not complex, nor was the plaintiff's legal theory novel. The

---

**20.** While Moussa Aryeh insisted, time and time again, that the defendants had misrepresented the fact that the property in question was "landlocked" for sewer purposes, such assertions cannot form the basis of a misrepresentation. The plaintiff was in as good a position as the defendants to determine whether the topography of the property would allow all the lots in a subdivision located on the site to be connected to municipal sewers without the use of pumping stations or easements across other properties. Eliyahou Aryeh, the "front man" for the plaintiff, was a licensed real estate agent. *See* N.T. May 22, 1992 at 15; N.T. May 27, 1992 at 94; N.T. May 29, 1992 at 29. It is objectively unreasonable for him, and those he worked for, to maintain that they did not know what an "easement" was. Furthermore, the plaintiff's witnesses testified that Lower Macungie Township was considering allowing the plaintiff to install pumping stations on the property. *See* N.T. May 28, 1992 at 193–94. For these reasons, it is clear to the court (and, objectively speaking, it should have been clear to Project 74 and its principals) that the property is not landlocked for sewer purposes, and therefore representa-

tions that the property was served by municipal sewer lines were not false. Since the plaintiff admitted that, should it able to receive subdivision approval, the "deal" would have been fair in all respects, *see* N.T. May 22, 1992 at 42; N.T. May 28, 1992 at 76–77; N.T. May 28, 1992 at 105; N.T. May 28 1992 at 191–92, the plaintiff has no grounds for alleging that misrepresentations were made, or that RICO was violated.

**21.** Since Rule 11 involves an objective inquiry, the affidavits submitted by the plaintiff, its principals, and its attorneys, in which they profess a continuing (subjective) belief in the allegations contained in the complaint, are not relevant.

**22.** *Cf.* N.T. May 29, 1992 at 86–87 ("Q: By the way, when the balloon payment did—was due, which was about June of 1991, you and your family didn't have the money to pay it, did you? A: No.").

**23.** To say that the plaintiff was unaware of the facts underlying the complaint is, in a sense, a truism. Sanctions are being imposed in this case precisely because it has no factual basis.

plaintiff alleged that the defendants conspired to defraud it, and that they made material misrepresentations concerning the land the plaintiff eventually purchased. While Mr. Aronow was obliged to rely on his clients for information concerning the transaction, this should not have caused any difficulties. When filing a complaint based on alleged misrepresentations, an attorney has, at the very least, the duty to ask her client what the misrepresentations were. If the client responds "I don't know," the lawyer cannot, within the constraints of Rule 11, file a complaint. A complaint can only be filed after at least *some* evidence is discovered which can demonstrate that particular misrepresentations were made.[24]

Indeed, the court finds no mitigating factors which would lessen the severity of Mr. Aronow's breach of Rule 11. This case was not referred to him by another member of the bar, nor was it filed on the last day before the running of the statute of limitations. Although the legal position taken in the complaint was certainly plausible, the court must again state that the plaintiff was not able to produce any facts to support its legal theory. Simply put, this complaint should never have been filed. Because of the filing of the complaint, three defendants were forced to spend vast sums of money to mount a defense, and one was forced to proceed *pro se*. The court cannot condone such a waste of resources. In order to prevent Mr. Aronow, or a similarly situated attorney, from filing such a complaint in the future without performing an adequate pre-filing investigation, a substantial sanction will be imposed.

For violating Rule 11, Joseph Aronow is sanctioned in the amount of $50,000, and is ordered to pay such monies to the defendants in accordance with Section VI. of this Opinion.

### 2. Michael Manarel

Michael Manarel's signature does not appear on the complaint. Indeed, since he did not become a member of the law firm which represented the plaintiff until December 2, 1991, his signature does not appear on a great many documents which were filed in this case. Rather than analyze each document Mr. Manarel signed, the court will examine paragraph ten of the Plaintiff's Response to Defendant Lynda Moyer's Interrogatories. This paragraph contains a statement that all of the defendants, with the exception of Dr. Reichard, made false statements or misrepresentations. As it has been demonstrated, the plaintiff was unable to present any evidence to support this assertion. Since Rule 26(g), rather than Rule 11, governs responses to interrogatories, no sanction will be imposed under Rule 11. Mr. Manarel's obligations under Rule 26(g) will be discussed *infra*, in Section V.B.1. of this Opinion.

### 3. Project 74

■ The court has the power to impose sanctions on either the attorney or the party which has violated Rule 11. As it has already been stated, the complaint in this action was filed in violation of Rule 11. No sanction will be imposed on Project 74 Allentown, however, because the corporation has filed for bankruptcy, and has stated in its bankruptcy filings that its liabilities exceed its assets.

### 4. Eliyahou Aryeh

The court is not aware of the existence of any pleadings, motions, or other papers signed by Eliyahou Aryeh in this case. He is therefore not subject to Rule 11 sanctions.

### 5. Moussa Aryeh

Moussa Aryeh signed a verification of the Plaintiff's Response to Defendant Lynda Moyer's First Set of Interrogatories, *see* N.T. May 29, 1992 at 53, in which he swore

---

**24.** Fraud must be plead with particularity, and proven by evidence which is clear, precise, and convincing. *See Loranger Plastics Corp. v. Incoe Corp.*, 670 F.Supp. 145, 147 (W.D.Pa.1987); *Snell v. Commonwealth of Pennsylvania, State Examining Board*, 416 A.2d 468, 470 (Pa.1980); *Catagnus v. Montgomery County*, 113 Pa. Cmwlth. 129, 536 A.2d 505, 508 (1988).

that he had read the response and knew it to be true. The court is not aware of any other pleadings, motions or other papers in this case which were signed by Moussa Aryeh. Since Rule 26(g), rather than Rule 11, governs responses to interrogatories, no sanction will be imposed under Rule 11. Moussa Aryeh's obligations under Rule 26(g) will be discussed *infra*, in Section V.B.2. of this Opinion.

### 6. Ouriel Aryeh

The court is not aware of the existence of any pleadings, motions, or other papers signed by Oriel Aryeh in this case. He is therefore not subject to Rule 11 sanctions.

### 7. Abraham Arab

▮▮▮▮ The complaint in this action was accompanied by a verification signed by Abraham Arab. An individual who signs a verification is subject to the duties imposed by Rule 11, even if verification is not mandatory. As it has been demonstrated *supra* in Section V.A.1. of this Opinion, the complaint was signed in violation of Rule 11.[25] Given Mr. Arab's involvement in other real estate ventures, and the need to deter other real estate purchasers from filing RICO claims as a delaying tactic to forestall foreclosure, a heavy sanction is merited. For violating Rule 11, Abraham Arab is sanctioned in the amount of $50,000, and is ordered to pay such monies to the defendants in accordance with Section VI. of this Opinion.

### B. Under Rule 26(g)

### 1. Michael Manarel

▮▮▮▮ The Response to defendant Lynda Moyer's First Set of Interrogatories states, *inter alia*, that "[e]ach defendant, with the exception of Dr. Robert Reichard, has made statements which were false, fraudulent, and/or misrepresentations." Response at ¶ 10. This response was signed by Michael Manarel. At trial, the plaintiff could not come forward with any evidence of any false or fraudulent statements made by any of the defendants. *See Project 74*, 1992 Westlaw 151319 at *2; *supra*, Section V.A.1. If the plaintiff had admitted that it could not produce any evidence of any false or fraudulent statements, the court would have entered summary judgment against the plaintiff, since it is axiomatic that a plaintiff cannot prevail in a case alleging a RICO conspiracy to defraud without some proof that a fraud occurred.

Looking to the *Lingle* factors for guidance in determining the appropriate sanction under Rule 26(g), the court finds that Michael Manarel had adequate time to perform a prefiling investigation. The interrogatories were filed on November 21, 1991, over six months after the complaint was filed. The plaintiff should not have been surprised that the defendants asked the plaintiff to specify which statements were allegedly false or fraudulent. Indeed, as it has been stated *supra*, the plaintiff should have been in the possession of some evidence of false and fraudulent statements before a complaint was ever filed.

Even if no investigation had begun prior to the receipt of the interrogatories, Mr. Manarel had thirty days in which to investigate. While the court recognizes that Mr. Manarel joined the firm representing the plaintiff on December 2, 1991, this does not excuse him from his obligation to make an adequate investigation. Had he believed that he lacked adequate time to investigate, his remedy was not to sign a response "blindly" and risk violating Rule 26(g), he should have moved for an extension of time in which to answer.

The court finds that, while Mr. Manarel was obliged to rely on his clients for information relating to statements and repre-

---

**25.** If anything, Abraham Arab was in a better position than Mr. Aronow to investigate the facts underlying this complaint. He was, after all, one of the principals involved in the underlying transaction. The court assumes that, had Abraham Arab known of any misrepresentations made by the defendants, he would have recounted them on the stand. Since he was not called to testify, the court infers that he has no knowledge of any misrepresentations made by the defendants. Verifying a complaint which alleges misrepresentation when one has no knowledge that a misrepresentation occurred is a violation of Rule 11.

sentations made by the defendants to the plaintiff, any adequate investigation would have disclosed the fact that *not one* of the plaintiff's agents, officers or employees could recall a *single* false statement or misrepresentation. This is especially true since the facts surrounding this interrogatory (identify all false statements or misrepresentations) are not complex.[26]

The court does find two factors mitigating against imposing a heavy sanction on Mr. Manarel, however. First, Mr. Manarel is an inexperienced lawyer. Although inexperience is not a defense to a violation of Rule 26(g) or Rule 11, it is a factor which the court can take into account when determining the appropriate sanction. Second, this matter was referred to Mr. Manarel by another member of the bar; Mr. Aronow. The court is not unmindful of the difficulties a young associate faces when she is given an unpalatable assignment by a senior attorney. Refusing to work on a case a young associate believes to be unmeritorious will not serve to raise that associate's standing within the firm. Such concerns do not, however, relieve a lawyer of her obligations under Rule 26(g) or Rule 11. The court will, however, consider them as mitigating circumstances.

For violating Rule 26(g), Michael Manarel is sanctioned in the amount of $100, and is ordered to pay such monies to the defendants in accordance with Section VI. of this Opinion.

### 2. Moussa Aryeh

Moussa Aryeh signed a verification of a Response to defendant Lynda Moyer's First Set of Interrogatories. *See* N.T. May 29, 1992 at 53. In that verifica-

tion, Moussa Aryeh swore that the answers contained in the response were true. *See* N.T. May 29, 1992 at 54. As the discussion in Section V.B.1. of this Opinion has demonstrated, this response was filed in violation of Rule 26(g).[27]

Given Moussa Aryeh's involvement in other real estate ventures, and the need to deter other real estate purchasers from filing RICO claims as a delaying tactic to forestall foreclosure, a heavy sanction is merited. For violating Rule 26(g), Moussa Aryeh is sanctioned in the amount of $100,000, and is ordered to pay such monies to the defendants in accordance with Section VI. of this Opinion.

### VI. *Priority*

Rather than simply ordering the sanctioned parties to pay money to the "defendants," the court believes that the interests of justice will be served if a priority system (akin to that used for multiple mortgages on a single piece of property) is established. While any party may receive, levy on, garnish, or seize, funds or assets from the sanctioned parties in order to satisfy the awards the court has made, no party shall have the right to retain any funds or property until those with "higher priority" have been satisfied.

The court has imposed sanctions totaling $200,100. These monies shall be distributed as follows:

1. Christine Nealy shall receive $10,100;

2. Lynda Moyer shall receive $110,000;

3. Beverly Frost and Dr. Robert Reichard (jointly and severally) shall receive $65,000;

4. Barry Isett and Associates shall receive $15,000.[28]

---

**26.** Since a discovery response does not advocate a legal position, that factor is not relevant to whether Mr. Manarel violated Rule 26(g).

**27.** In much the same way as Abraham Arab was in as good or a better position than Mr. Aronow to investigate the facts underlying the complaint, *see supra* note 25, Moussa Aryeh was in as good or a better position than Mr. Manarel to investigate the facts underlying the discovery response. Since Mr. Arab could not recall a single misrepresentation or false statement

when he was called to the witness stand, *see supra* Section V.A.1., his verification of an answer stating that such false statements and misrepresentations had been made was in violation of Rule 26(g).

**28.** The court offers the following justification for this distribution and system of priorities. Defendant Nealy had, essentially, nothing to do with the transaction which gave rise to this lawsuit. She was also the party who was the least able to represent herself (since she was

### VII. *Conclusion*

For the foregoing reasons, the defendants' Motions for Rule 11 sanctions will be granted.

obliged to proceed *pro se*), and therefore the party most vulnerable to being coerced into paying a nuisance value settlement out of a fear of being immersed in endless litigation. It is *for these reasons that the court believes that* defendant Nealy is the most deserving of relief. The court also desires to deter parties with resources from bringing frivolous suits against parties without resources in the hopes of exacting a settlement. The court believes that an award of $10,100 will redress the damage done to defendant Nealy by this lawsuit. Had she been forced (or able) to expend monies on professional representation, her award would have been greater. The court is also mindful that, by giving her the first priority, the attorneys representing other parties will have a powerful incentive to collect defendant Nealy's judgment for her. In this way, *defendant Nealy can be compensated without enmeshing her in further legal proceedings.*

Defendant Moyer took the lead in defending this case, and her legal fees reflect this decision. It is for this reason that defendant Moyer will receive the largest award. She was, however, the most involved in the transaction which gave rise to this lawsuit. For this reason, defendant Moyer will *recover a smaller percentage of the* resources she expended than other defendants will. Since, as it has been stated, defendant Moyer's counsel took the lead in defending this case, defendant Moyer's counsel will also be allowed to take the lead (over other counsel, but not over defendant Nealy) in recovering sanctions.

Like defendant Nealy, defendants Frost and Reichard had little to do with the transaction *underlying this case. For this reason, they will* be permitted to recover a large percentage of the (substantial) resources they expended in mounting a defense. Since, however, defendants Frost and Reichard possess substantial resources, the court is less worried that they, or defendants in a similar situation, will be victimized by a frivolous lawsuit in the future. Their ability to mount an effective defense has an independent deterrent effect. Additionally, while counsel for defendants Frost and Reichard actively participated in this case, he did not assume the lead. It is for this reason that defendants Frost and Reichard are accorded third priority by the court. The court is also aware that awarding defendants Frost and Reichard third priority will make it very likely that the vast majority of the court's sanctions will actually be paid.

Finally, defendant Isett is accorded fourth priority because of its role in mounting a defense. Defendant Isett contributed the fewest resources, and expended the least energy. For this reason, the court assigns defendant Isett the lowest priority. Defendant Isett will, however, be allowed to recover a substantial percentage of the resources it committed to this case, should it decide to pursue the monies the court has awarded.